[No. 35019-0-II.   Division Two.   January 29, 2008.]

THE STATE OF WASHINGTON, *Respondent*, v. RYNA RA, *Appellant*.

*Robert C. Freeby* and *C. Phillip Bolland*, for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Michelle Hyer, Deputy*, for respondent.

¶1 ARMSTRONG, J. — Ryna Ra appeals his convictions for attempted murder in the first degree, drive-by shooting, and second degree unlawful possession of a firearm, arguing that the trial court improperly allowed the State to introduce gang evidence in violation of an order prohibiting such evidence and that the prosecutor then committed misconduct in arguing "gang theory" in closing argument. Ra also challenges the sufficiency of the evidence to prove premeditation, and he argues that the trial court (1) appeared to be partial to the State and (2) erred in rejecting his proposed self-defense instruction. We agree with Ra that the trial court mishandled the gang evidence; accordingly, we reverse and remand.

## FACTS

¶2 One evening, Ryna Ra and three friends (Vuthy Chau, Samnang Bun, and Dy Son) were parked in a silver sport utility vehicle (SUV) on the Ruston Way waterfront. Ra was in the front passenger seat, and Bun was in the rear passenger seat. Two cars pulled into the same parking lot together, containing two couples who were friends: James Huff and Vianna Cornatzer, and Nick Serdar and Ashley

Suhoversnik. One or two empty parking stalls separated the SUV from the nearest of the two cars, which was owned by Suhoversnik. Neither Ra nor any of his companions had ever met any member of the other group.

¶3 When the two girls got out of their cars, some of the young men in the SUV began cat-calling about the young women. The SUV occupants also directed some comments at Huff and Serdar, including go ahead and "do something," "I'm going to get your girlfriend," and "I'm going to kick your f---ing ass." Report of Proceedings (RP) at 233-34, 448. When the comments continued, Huff angrily approached the SUV. Ra fired three or four shots as Huff approached. Huff got close enough to kick at the SUV when the third or fourth shot hit him in the chest. The SUV left but was overtaken by police almost immediately. Later, the police found the weapon used in the shooting in some low bushes in an empty lot along Ruston Way.

¶4 Witnesses testified that as Huff approached the SUV he said, "Let's get out and fight," or "What the f--- is your problem?" RP at 308, 453. Others testified that Huff shoved his companions aside as he ran toward the SUV. Ra also testified that Huff responded to the cat-calling by shining a flashlight toward them, which Ra found "really disrespectful." RP at 810.

¶5 Ra and several of his friends testified that Ra told Huff to shop shining the flashlight at them, and then, when Huff was about 20 feet away, Ra fired a warning shot into the air. Ra was trying "to . . . scare him off. He wasn't scared. . . . I don't know how to defend myself after that." RP at 861. Ra then shot a window out from the SUV to let Huff know he had a real gun. When Huff kept coming, "jump-kick[ed] the car," and tried to open the door, Ra fired the last shot. RP at 812.

¶6 Son testified that Huff's approach to the SUV "was unexpected." RP at 600. Chau testified that he was afraid of Huff because he was "trying to attack" him and Ra. RP at 163. Bun testified that Huff was trying to reach in and grab Ra through the window.

¶7  Serdar testified that he was standing almost directly behind Huff when Ra first shot; he heard a "whooshing, or a whizzing kind of sound" go by them. RP at 457. Serdar described all the shots as "semi-rapid succession," with the second shot fired when Huff was about 16 feet from the SUV and the later shots when Huff was much closer. RP at 452. Chau testified that Ra's second shot was aimed at Huff's body. Huff testified that when he was about two to three feet from the SUV, he saw the gun pointed at his head and a flash that went past the side of his head. He tried to kick the gun out of Ra's hand, but missed, kicking the door of the SUV instead. After the attempted kick, Ra pointed the gun at Huff and shot him in the chest.

A. Gang Evidence

¶8  Before trial, the State agreed that it would not offer gang evidence. Yet, during the State's direct examination of Detective John Bair, the prosecutor asked, "Are you presently in a specific unit of the Tacoma Police Department?" and "What unit are you in?" RP at 714-15. Detective Bair responded that he was in the "gang unit," then explained how cases are assigned in that unit and that the case at issue had been so assigned. RP at 715.

¶9  The prosecution also questioned Bun about his reasons for carrying a gun that evening. Those questions included, "Mr. Bun, was it because that's what you do, carry guns?" RP at 745; "Isn't it true that when you carry a gun and you're with Mr. Ra and you know he has a gun, and with your other friends, you know that you're prepared and nobody messes with you; correct?" RP at 745; "[Y]ou and your friends don't -- at least on this evening, you don't have to take anything from anyone. You've got guns. You're in charge. Correct?" RP at 750; and "Why is it difficult to answer these questions? Is there a loyalty involved?"[1] RP at 746.

¶10  On direct examination, Ra testified that he had purchased the gun about two weeks before the incident and

---

[1] Mr. Bun answered "[n]o" to all of these questions. RP at 745-46, 750.

he was carrying it because Chau had "told [him] to bring it because he said it looks really nice and he [had] never seen a silver gun." RP at 806. He also testified that he did not know that as a convicted felon, he was not supposed to have a gun because his convictions had been 5 to 6 years earlier when he was about 14 years old, and he had not read through all the paperwork at the time because he was with his dad and just signed everything put in front of him.

¶11 Before cross-examination, the State moved to admit gang evidence because the defendant "open[ed] the door" by testifying that (1) he did not know he could not have a gun, (2) he's "not like that" to make cat-calls and they offended him, (3) Chau wanted him to carry the gun, and (4) he does not believe in shootings. RP at 814.

¶12 The trial court ultimately denied the State's motion, but before doing so, it discussed Ra's possible motives:

> THE COURT: What about some distorted feeling or motivation that they're big men, that they're very important people and they want to show the rest of their friends that they can take a weapon that makes them ten feet tall and kill somebody or attempt to kill somebody; and we're showing off for those in our gang, in our group, just how big we are; and we live in a free country and we can get away with it because this country is based on fundamental rights and based on non-violent behavior and freedom, and everybody is free to be in the neighborhood and go for a walk on the pier and not be subjected to some distorted character who breeds and lives violently --
>
> [DEFENSE]: That's the type of 404(b) allegations --
>
> THE COURT: -- and gets away with it because we live in a free country that protects individual rights.
>
> [DEFENSE]: He doesn't get away with it.
>
> THE COURT: Well, they get away with it time and time again.
>
> [DEFENSE]: Well, when you say they, I'm assuming you don't mean Mr. Ra.
>
> THE COURT: No. Absolutely right, I don't mean Mr. Ra.
>
> [DEFENSE]: Then the problem is that's exactly the type --

THE COURT: Unless the shoe fits, then you have to wear it.

. . . .

[STATE]: I think it is accurate that the reason he shot was to elevate his status among his peers.

THE COURT: Bravado, distorted importance.

[STATE]: That's right, and that's elevating his status. And in a gang situation, there are no elected leaders. The leaders are those who are most violent. The most respected gang leaders are those that are feared the most, those that actually use the gun.

THE COURT: But it still gets back, [Mr. Prosecutor], to whether this court, under the law, can admit gang evidence, gang association evidence. . . . The question is, is that admissible? And it's not.

[STATE]: The part that I just talked about is not.

THE COURT: Because we live in this country.

[STATE]: And I agree with the Court.

THE COURT: And it is abused by many people. [*To Ra:*] Don't shake your head up and down at me as if you are agreeing with me.

RP at 829-30, 846-47. The trial court then denied the State's motion to allow the gang evidence, although it admitted Ra's four prior felony convictions for use on cross-examination.

## B. Jury Instructions/Self-Defense

¶13 After the close of the evidence, the defense offered a self-defense instruction. The State opposed the instruction, and the court ruled:

Under the circumstances . . . I don't believe a reasonable person under these same or similar circumstances would have done what Mr. Ra did. I think it was excessive force. It appears to me that it was a lot of bravado involved, some distorted playing big man mentality, showing off in front of the other folks in that vehicle, and that's why he shot. And there wasn't any fear of any harm, great bodily harm, or death, either subjectively or objectively. It was he was showing off and egged

them on to get him over there so he could show off and kill somebody.

. . . [A] reasonable person of the same or similar circumstances that Mr. Ra was under would not have done this, and I am quarrelling with what he says his motivation was and that his state of mind was, as I've indicated. So, there will be no self-defense instruction.

RP at 890-91.

## C. Closing Arguments

¶14 During the State's closing argument, the prosecutor discussed a "cultural issue":

There's only one culture involved in this case, and that's the culture of America. That's the culture of violence. That's the culture that says somebody who is a convicted felon, who is not yet 20 years old, doesn't care whether he's been convicted four times, he finds a way to get a weapon, not at a gun store, not legally, but through some person in the underground world that can provide him with a weapon capable of killing someone. And why does somebody like that, in our day and age, want a weapon? Probably because of our culture. Probably because of the music, because of the attitudes, because of everything that you can think of that's mixed up into what goes through a person like this' mind at that stage of his life. He doesn't have to be big and strong and muscular, because it's not fist fights anymore, it's gun battles.

RP at 908-09.

¶15 He later argued Ra's "state of mind":

There were three people with the defendant. That also reflects on his state of mind because he's buttressed. His status is elevated. When he acts as a bad guy in front of these other bad guys -- and I say that because two other of those guys are felons, and I'm not talking about their character, I'm talking about the fact that another one has a firearm in the car and the other one knows that the others have firearms. And they don't care. . . . They're bad guys in that sense. They're tough. And if one of those guys shoots and kills somebody or hurts somebody badly, the others don't say, oh, my God, what did you do? No. It

elevates the status of that person. He's the baddest of the bad. . . . Which one of those persons that was pulled over five minutes later was so concerned about the victim and what had happened? None of them. That's the culture. It's not a big deal somebody got shot. It's all about protecting themselves. It's all about now we're in trouble. . . . Now I've been with somebody who did something, but I'm not gonna snitch, because that's the culture, too.

RP at 912-13.

¶16 In rebuttal argument, the prosecutor argued,

So, this is our system. Apparently, if you go out as a four-time convicted felon with a loaded firearm, with a bunch of other guys that are felons and another one with a firearm, and you start challenging and making rude comments toward people and somebody doesn't like it and asks you to stop or turns to address the situation, one, you can shoot them, guess you could kill 'em. . . . Nobody in civilized communities, and especially in Pierce County, should accept that what these people were saying and doing is normal activity for teenagers. . . . They're violent and they're disruptive, and they're ruining -- in this case almost ending -- somebody's life. . . .

RP at 932-33.

¶17 The jury convicted Ra of attempted murder in the first degree while armed with a firearm, drive-by shooting, and second degree unlawful possession of a firearm.

## D. Sentencing

¶18 At sentencing, the State sought the maximum sentence of 291 months plus a 60-month firearm enhancement. The court commented:

In the society that we live in in Pierce County, isn't it apparent, assuming that there are gang activities in this county, which, if you will, you can use a judicial term, "judicial notice;" and that as a matter of fact it's believed that gangs live by the innocuous -- as you want me to believe -- activity of stealing cars. That's their method of supporting themselves. For one thing, it brings little in the way of penalty if they're caught; a fairly simple

activity. I mean, there are those that believe it is not innocuous, it's a means of supporting themselves.

RP at 978.

¶19 Defense counsel argued that Ra had come from a supportive family with a father who had worked his way from the "bottom of the social ladder" as a Cambodian refugee. RP at 979. The trial court responded, "The father followed the American way and made a good life for himself. That's the same life and American way that Mr. Huff was trying to protect in Iraq; correct?" RP at 980. Defense counsel responded that he didn't know what Huff's motivations were: "For all I know, he went over there because he liked to kill people. I don't know that. Maybe he was trying to protect the American way of life. Maybe he was trying to protect oil revenue." RP at 980. The court responded, "I found it offensive for you to say what you said, quite frankly, but that's not going to affect what I have to do here today. But, to say that this young man, who was very impressive to the Court and was fighting for our country was over there maybe just to kill people, I find offensive and I have to tell you that." RP at 990.

¶20 The trial court sentenced Ra to the statutory maximum of 351 months, stating:

What occurred at Les Davis Pier in this city was reprehensible. There was no need for it other than some distorted, in my mind, belief regarding bravado that I'm a big man, that I'm very important, I'm gonna show off for my fellow compatriots, the other three in the car, the four of you. And, unfortunately, the victim of all this attention is a young man who I'm convinced did have the greatest motives to protect his country, got blown up in Iraq, his fellow soldiers, some of them died. He came back and gets shot and almost killed in this country he is trying to defend. It's reprehensible. And I'm convinced, with your criminal history, that your activities are not innocuous, that they were a means for you to support yourself and to live however you wanted to live, by stealing cars. I'm not naive.

RP at 992-93.

## ANALYSIS

### I. Gang Evidence

¶21 Ra argues that the State presented "gang evidence" in violation of the trial court's prior ruling excluding such evidence. Br. of Appellant at 34. The two specific instances of "gang evidence" are (1) Detective Bair's testimony that he was a member of Tacoma Police Department's gang unit and was assigned to this case and (2) the prosecutor's "testimonial questioning" of Bun suggesting that carrying guns is "what [they] do" and that there was "a loyalty involved" in his delay in answering questions. The State argues that Ra failed to object to either of these incidents as gang-related and that even if the issue was preserved, the evidence was not, in fact, gang evidence.

### A. Preservation

¶22 Generally, to preserve an issue for appeal, a party must object to inadmissible evidence when it is offered during trial even when the trial court has already excluded it through a pretrial order. *State v. Weber*, 159 Wn.2d 252, 272, 149 P.3d 646 (2006) (citing *State v. Sullivan*, 69 Wn. App. 167, 173, 847 P.2d 953 (1993)), *cert. denied*, 127 S. Ct. 2986 (2007). This gives the trial court the opportunity to determine whether the evidence is covered by the pretrial motion and, if so, whether the court can cure any potential prejudice through an instruction. *See Weber*, 159 Wn.2d at 272. There is, however, an exception to the objection requirement where "an unusual circumstance exists 'that makes it impossible to avoid the prejudicial impact of evidence that had previously been ruled inadmissible.'" *Weber*, 159 Wn.2d at 272 (quoting *Sullivan*, 69 Wn. App. at 173). Examples of such unusual circumstances are when the other party's questions were "'in deliberate disregard of the trial court's ruling,' or 'an objection by itself would be so damaging as to be immune from any admoni-

tion or curative instruction by the trial court.' " *Weber*, 159 Wn.2d at 272 (quoting *Sullivan*, 69 Wn. App. at 173); *see also State v. Smith*, 189 Wash. 422, 428-29, 65 P.2d 1075 (1937).

¶23 Here, the prosecutor deliberately questioned Detective Bair about his gang unit and why the case was assigned to him. He also deliberately questioned Bun about his and the group's gang-like behavior, whether carrying guns is "what [they] do," whether "when [they] carry . . . gun[s] . . . nobody messes with [them]," and whether there was "a loyalty involved." Finally, in closing, the prosecutor argued that Ra belonged to a culture of violence and that he elevated his status in his group, becoming the "baddest of the bad," by carrying a firearm and shooting someone. We are unwilling to assume that the jury missed the State's message. And because the State deliberately elicited the gang evidence and then argued it, Ra did not waive the issue by failing to object. *See Weber*, 159 Wn.2d at 272.

B. Prejudice

¶24 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conforming with it. ER 404(b). Gang evidence falls within the scope of ER 404(b). *See State v. Boot*, 89 Wn. App. 780, 788-89, 950 P.2d 964 (1998). It may be admissible for other purposes, such as proof of motive, intent, or res gestae, but before a trial court may admit such evidence, it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who

would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

■ ¶25  But because of the indirect manner in which the State presented the evidence, the trial court never had the opportunity to conduct an ER 404(b) analysis. And the State never presented evidence that Ra was a gang member and, if so, what the gang mores were. Without such evidence, we have no basis to conclude that the State's gang evidence was admissible under ER 404(b).

■ ¶26  Finally, the evidence portrayed Ra and his companions as inherently "bad guys," willing to commit the most serious acts of violence to elevate their status in the group. This invited the jury to make the "forbidden inference" underlying ER 404(b) that Ra's prior bad acts showed his propensity to commit the crimes charged. *State v. Wade*, 98 Wn. App. 328, 336, 989 P.2d 576 (1999). The State's suggestions that this was a gang crime (assigned to the police gang unit) and that Ra intentionally shot Huff to elevate his status in his group fed the prosecutor's "culture" theme in closing argument. Because the wrongly admitted evidence unfairly prejudiced Ra, we have no alternative but to reverse his convictions for attempted first degree murder and drive-by shooting.

¶27  We consider further only those issues dealing with the sufficiency of the evidence or issues likely to arise on retrial.

## II. SUFFICIENCY OF EVIDENCE FOR PREMEDITATION

¶28  Ra next argues that the State presented insufficient evidence that he premeditated the attempted killing because (1) he made no statements before the incident showing that he intended to kill Huff or anyone else, (2) he and his friends had no prior relationship with the victim and his friends and thus no motive to kill Huff, and (3) there was no evidence that he sought higher gang status or shot Huff for some other gang-related reason.

■ ¶29  To prevail on a challenge to the sufficiency of the evidence, Ra must show that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Allen*, 159 Wn.2d 1, 7, 147 P.3d 581 (2006). In testing the sufficiency of the evidence, we view the evidence in the light most favorable to the State, drawing all reasonable inferences from the evidence in the State's favor. *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006) (quoting *State v. Clark*, 143 Wn.2d 731, 769, 24 P.3d 1006 (2001)). Here, the State charged Ra with attempted premeditated first degree murder, so it had to prove beyond a reasonable doubt that Ra acted with premeditated intent to cause Huff's death. RCW 9A.32.030(1)(a).

■ ¶30  Premeditation is the deliberate formation of and reflection on the intent to take a human life and involves the mental process of thinking beforehand, deliberating on, or weighing the contemplated act for a period of time, however short. *Allen*, 159 Wn.2d at 7-8. Premeditation must involve more than a moment in time. RCW 9A.32.020(1); *Allen*, 159 Wn.2d at 8. The State can prove premeditation by circumstantial evidence where the inferences argued are reasonable and the evidence supporting them is substantial. *Clark*, 143 Wn.2d at 769. Examples of circumstances supporting a finding of premeditation include motive, prior threats, multiple wounds inflicted or multiple shots, striking the victim from behind, assault with multiple means or a weapon not readily available, and the planned presence of a weapon at the scene. *See Allen*, 159 Wn.2d at 8; *Clark*, 143 Wn.2d at 769; *State v. Pirtle*, 127 Wn.2d 628, 644-45, 904 P.2d 245 (1995); *State v. Hoffman*, 116 Wn.2d 51, 83, 804 P.2d 577 (1991).

¶31  Here, when viewed in the light most favorable to the State, the evidence supports findings that Ra intentionally brought a loaded firearm to the scene, provoked a confrontation with Huff, then fired multiple shots at him. The first shot whizzed by Serdar, who was standing directly behind Huff. During the second shot, Huff saw the gun pointed at

his head and a flash that went past the side of his head. Finally, Ra aimed and fired a third shot directly at Huff's chest from two to three feet away. This evidence supports an inference that Ra was aiming the gun at Huff from the beginning and intended to kill him. *Hoffman*, 116 Wn.2d at 84-85 (proof that a defendant fired a weapon at the victim is sufficient to justify finding of intent to kill). At least one witness testified that there was a "pause" between shots, which supports an inference that Ra had time to deliberate on and weigh his decision to kill Huff. RP at 781. And this, coupled with Ra's continued firing after missing twice, supports a finding of premeditation. *Cf. State v. Ross*, 56 Wn.2d 344, 350-51, 353 P.2d 885 (1960) (even though defendant did not know victim and had spoken with him only a few minutes when shooting occurred, jury was entitled to find that a sufficiently appreciable period of time elapsed for him to form an intent and reflect upon it); *State v. Massey*, 60 Wn. App. 131, 145, 803 P.2d 340 (1990) (planned presence of a deadly weapon adequate to allow issue of premeditation to go to jury). We conclude that the State presented sufficient evidence to support a finding that Ra premeditated killing Huff.

### III. JUDICIAL IMPARTIALITY

¶32 Ra further argues that the trial court did not display the appearance of impartiality during trial and sentencing, thereby denying him due process and a fair trial. The trial court's bias allegedly appears in (1) its colloquy with counsel regarding the State's final request for the admission of gang evidence, (2) its suggestion or proposal of the argument that later became the "elevated status" theme of the prosecutor's closing statement, and (3) its comments at sentencing regarding Huff's "protection of the American way of life" in Iraq.

¶33 Due process, the appearance of fairness, and canon 3(D)(1) of the Code of Judicial Conduct require disqualification of a judge who is biased against a party or

whose impartiality may be reasonably questioned. *State v. Perala*, 132 Wn. App. 98, 110-11, 130 P.3d 852, *review denied*, 158 Wn.2d 1018 (2006). A judicial proceeding is valid only if it has an appearance of impartiality, such that a reasonably prudent and disinterested person would conclude that all parties obtained a fair, impartial, and neutral hearing. *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995) (quoting *State v. Ladenburg*, 67 Wn. App. 749, 754-55, 840 P.2d 228 (1992)).

¶34 We agree with Ra that the trial court's comments suggesting that Ra was "some distorted character who breeds and lives violently," RP at 829, and scolding him for apparently nodding "as if you are agreeing with me," RP at 847, were inappropriate, "[did] not show proper restraint[,] and should not have been made." *State v. Ingle*, 64 Wn.2d 491, 499, 392 P.2d 442 (1964). Moreover, we find inappropriate the trial court's proposal of theories for the State to use in admitting improper ER 404(b) evidence. A trial court should not enter into the "fray of combat" or assume the role of counsel.[2] *Egede-Nissen v. Crystal Mountain, Inc.*, 93 Wn.2d 127, 141, 606 P.2d 1214 (1980) (regarding court's interjection of itself into trial in front of the jury). Finally, the trial court's evident and potentially undue concern for the victim's war record is troubling. Because we reverse for admitting the gang evidence, we need not consider whether the trial court's appearance of partiality alone would warrant reversal. But on remand, we direct that the case be assigned to another judge.

---

[2] *See also* RP at 856 (defense counsel objects because "[c]ounsel is testifying"; trial court responds, "He may ask. It's preparatory to asking the question. [*To prosecutor:*] Ask him if he knows that.").

IV. Statement of Additional Grounds for Review

<u>Reliance on Gang Theory in Denying Self-Defense Instruction</u>

¶35 In his statement of additional grounds,[3] Ra argues that the trial court improperly relied on gang evidence when it denied his proposed self-defense instruction, thereby deciding Ra's state of mind and motivation itself instead of submitting the issue to the jury.

¶36 The record affords some support for Ra's claim: the trial court did "quarrel[ ] with what he says his motivation was and [what] his state of mind was," speculating that "[i]t appears to me that it was a lot of bravado involved, some distorted playing big man mentality, showing off in front of the other folks in that vehicle, and that's why he shot." RP at 890-91.

¶37 A defendant is entitled to a self-defense instruction only if he has raised some credible evidence, from whatever source, that he feared death or great personal injury at the hands of the victim. RCW 9A.16.050; *State v. Read*, 147 Wn.2d 238, 242, 53 P.3d 26 (2002). The test has a subjective component: whether the defendant actually feared death or great personal injury; and an objective component: whether the defendant's fear of great harm was reasonable under the circumstances. *Read*, 147 Wn.2d at 242-43 (citing *State v. Walker*, 136 Wn.2d 767, 772, 966 P.2d 883 (1998)).

¶38 Ra offered no evidence that he actually feared that Huff would kill or seriously injure him. Neither he nor his companions testified that they feared great bodily harm or death when Huff approached the SUV. They testified that Huff ran toward the SUV, kicked it, and tried to reach through the window to grab Ra. But Ra produced no evidence that Huff was armed or threatened anything other than a fistfight. Moreover, no reasonable person in Ra's

[3] RAP 10.10.

situation could have believed that deadly force was necessary to counter the threat posed by Huff in approaching the SUV. *Walker*, 136 Wn.2d at 779 (no reasonable basis to use deadly force when facing only an ordinary battery). Thus, although the trial court may have erred by rejecting Ra's proposed self-defense instruction in part because the court believed that Ra shot Huff to "show off," the error was harmless. Ra failed to present sufficient evidence to raise self-defense.

¶39 The dissent notes, "[B]ecause we must remand for a new trial, whether a self-defense or defense of others instruction is appropriate must be determined on the evidence produced at that trial, not this one. Accordingly, it is premature to address the alleged instructional error and I would not reach the propriety of a self-defense instruction." Dissent at 708 (footnote omitted). We fully agree with the first sentence of this dissent; it goes without saying that the new trial court must determine anew whether a self-defense instruction is warranted based on the evidence offered at the new trial. We do not, however, agree with the dissent's assertion that it is, therefore, "premature" for us to reach the propriety of a self-defense instruction in our review of the case presently before us. On the contrary, although we reverse and remand for a new trial based on improper gang evidence, we think it prudent to address Ra's statement of additional grounds argument that we should reverse his conviction based on the trial court's failure to give a self-defense instruction.

¶40 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HUNT, J., concurs.

¶41 QUINN-BRINTNALL, J. (concurring in part and dissenting in part) — Except for the self-defense analysis, I agree

with the majority in all respects. First, I note that because we must remand for a new trial, whether a self-defense or defense of others instruction[4] is appropriate must be determined on the evidence produced at that trial, not this one. Accordingly, it is premature to address the alleged instructional error and I would not reach the propriety of a self-defense instruction. Also, much was made of the fact that the victim was a war veteran and we do not know his physical appearance from this record. It may be that, even unarmed, his size, training, and demeanor make him a deadly weapon and intimidating to others, and that the threat Ryna Ra believed he faced was more than "only an ordinary battery." Majority at 707 (citing *State v. Walker*, 136 Wn.2d 767, 779, 966 P.2d 883 (1998)).

¶42 Moreover, taken in the light most favorable to the party requesting the instruction, Ra, the record shows that James Huff's companions unsuccessfully attempted to stop Huff from approaching the sport utility vehicle (SUV), but that he shoved them aside and approached the SUV, yelling, "Let's get out and fight." 5 Report of Proceedings (RP) at 453. Ra testified that when Huff was 20 feet away, he fired a warning shot into the air, trying "to scare [Huff] off, but he was not scared, so [Ra] wouldn't know how to defend [him]self after that." 9 RP at 860. Huff kept coming, "jump-kick[ed] the car," and was trying to open the door to get at Ra when Ra fired the shot into Huff's chest. 8 RP at 812. This evidence indicates that Ra was trying to scare Huff off and, when that was not successful, he did not know how to defend himself except by shooting Huff. Whether this evidence is credible or what an ordinary reasonably prudent person would do under the circumstances as they appeared to Ra is an issue for the trier of fact. Here the trier of fact was the jury, not the trial court. The trial court's weighing of the credibility of Ra's testimony was error and,

---

[4] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02, at 176 (2d ed. 1994).

in my opinion on the evidence as it appears in this record, the jury should have been instructed on self-defense.

Review denied at 164 Wn.2d 1016 (2008).