[No. 26790-3-III.   Division Three.   August 11, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. JOSHUA CAMERON SCOTT, *Appellant*.

*James E. Egan* (of *James E. Egan, PS*), for appellant.

*Andrew K. Miller, Prosecuting Attorney,* and *Scott W. Johnson, Deputy,* for respondent.

¶1 Korsmo, J. — Evidence of street gang affiliation is admissible in a criminal trial if there is a nexus between the crime and gang membership. The trial court admitted gang evidence in Joshua Scott's trial subject to the prosecution providing evidence of the connection. That evidence was never produced. We conclude that this error was not harmless, reverse the defendant's convictions, and remand for a new trial.

## FACTS

¶2 Mr. Scott was a methamphetamine dealer. He supplied Mr. Shannon Younger who, in turn, sold drugs to others. One of Mr. Younger's clients was Wendy Grey

Vannauker, whom he also dated.[1] At one point Younger gave Wendy a .32 caliber handgun. Wendy later left Younger and moved in with Jeramie Vannauker. Wendy owed money to Mr. Younger for drugs and for damage done to his car while she was driving it.

¶3 Michael Pourier saw Wendy on January 8, 2007, and told her that Mr. Younger wanted his money and his gun back. She promised him she would return the gun the following day.

¶4 Returning to the trailer house where they were staying early on January 9, 2007, Wendy and Jeramie found a party in progress. One of the partygoers made a comment that led the couple to fear for their safety. They barricaded themselves in their bedroom and eventually fell asleep. At about 4:00 a.m. someone kicked the door in. Mr. Pourier was the first person through the door. He swung a baton at Jeramie and the two started fighting.

¶5 Jason Scott came through the door next and, according to Wendy's testimony, struck Jeramie on the head with a beer bottle. He then stabbed Jeramie three times with the broken bottle. Anthony Latta also entered the room and the three men began kicking and hitting Jeramie. Pourier demanded that Wendy tell him where the gun was located. He retrieved the gun from under the couple's bed.

¶6 While the three men were leaving the scene, Mr. Scott displayed zip ties and told Wendy that they were intended for her. He also repeatedly told her that this was how he helped his friends and that he was "not going to let his friends get taken." Wendy called 911 for help.

¶7 Benton County Sheriff's deputies arrived to find Jeramie lying on the bed. A large amount of blood and broken bottles and glass were in the room. Jeramie was taken to the hospital with near fatal injuries, including a collapsed lung. He had been stabbed in the lower back and

---

[1] Wendy married Jeramie Vannauker after the January 9 incident but was known as Wendy Grey to many of the witnesses. For convenience, we will refer to Wendy and Jeramie Vannauker by their first names.

the front chest areas. Jeramie eventually identified one of his assailants as "Mesclo," a street name for Mr. Scott. He was also able to identify another assailant as "Michael Who." Out of fear, Wendy initially refused to identify the assailants but ultimately identified the three men after Jeramie had spoken to the police.

¶8 Mr. Latta and Mr. Pourier were arrested by authorities in relatively short order, but Mr. Scott evaded capture. More than four months after the attack, deputies received word that Mr. Scott had been seen in Richland. A large law enforcement task force converged on a downtown hotel. Officers later testified that they saw members of the Sureños gang at the hotel and in a car Mr. Scott had been seen in. Mr. Scott was arrested in a hotel room; he had hidden his identification in a toilet. He told Corporal Darryl Judge that he had contemplated fleeing by jumping from the top balcony.

¶9 Mr. Scott was charged with one count of first degree assault for the attack with a beer bottle and a second count of first degree assault with a club as an accomplice to Michael Pourier. He also was charged with one count of first degree burglary. Deadly weapon enhancements were included in all three counts.

¶10 The prosecution moved *in limine* to admit evidence that Mr. Scott was a member of the West Side 18th Street Gang (18th Street gang), a subset of the Sureños, and that he committed the crimes because Wendy had shown the gang "disrespect." The defense opposed that request and also sought to exclude evidence that Mr. Scott dealt methamphetamine. The trial court heard argument and the State's offer of proof. The prosecutor argued that Wendy's disrespect provided both the defendant's intent and his motive for taking part in the attack. Furthermore, efforts by other gang members to intimidate Wendy also showed the gang connection to this case. The gang expert, Detective Lee Cantu, would testify to the importance of "respect" in the gang culture and why gang members would respond to

lack of respect with violence.[2] The court concluded that the evidence was admissible. "As long as the evidence is developed as the State anticipates, the Court would allow such evidence." Report of Proceedings 157.

¶11 Wendy testified to the assault as described previously. She also told jurors on direct examination about efforts made to intimidate her. She had been threatened 10 different times before trial. She had been spat upon on the way into court and she also identified members of the courtroom audience who were staring at her. She did not expressly identify any of the people present as gang members or associates. In the course of her testimony, she told jurors that she knew Mr. Scott was a member of the 18th Street gang. She identified the three assailants by their street names, which is how she knew them. Mr. Scott was known as "Mesclo."

¶12 Jeramie testified that Pourier broke into the room and struck him with a large riot baton. While the two men were fighting, Scott struck him on the head with a full bottle of beer and then used the broken bottle to stab him from behind. He collapsed to the floor and was stabbed in the front and again in the back. He stayed on the floor bleeding and unable to move while the three men ransacked the room for Younger's gun. Pourier also took the contents of a jewelry box and Latta stole other property. Jeramie testified that he had never met Shannon Younger and was barely acquainted with the three men who attacked him. He did not identify any of those four men as having gang affiliations.

¶13 Detective Cantu, the prosecution's gang expert, was also the chief investigator. The State's last witness, he testified extensively concerning the crime scene and the investigation. His testimony about gang matters, however, was very brief and covered about three pages of transcript. He confirmed that Mr. Scott was a member of the 18th Street gang and was known by the name of "Mesclo." He

---

[2] Report of Proceedings 155-156; Clerk's Papers 70.

also described, briefly, the division of the state of California into areas of gang influence between northern and southern groups. The Sureños have the southern part of the state. The 18th Street gang is a Sureños set. Detective Cantu was not asked about local members of the 18th Street gang, the place of "respect" in gang culture, gang response to "disrespect," or any connection between gang membership and the attack on Jeramie Vannauker. The prosecution rested its case after the detective's testimony.

¶14 The defense did not seek to strike the gang testimony and instead presented its own case. Mr. Scott, testifying in his own behalf, identified himself as a member of the 18th Street gang. He explained to the jury that he had accompanied Michael Pourier to a party that morning. Once he saw Pourier in a fight with Jeramie Vannauker, he went to Pourier's rescue and was merely defending his friend. He denied striking Jeramie with a bottle or any other object. He believed that Jeramie had a seizure and was injured flailing around on broken glass. On cross-examination, Mr. Scott admitted there were gang members in the courtroom watching proceedings. He told jurors that they were from a rival gang.

¶15 The deputy prosecutor argued the case to the jury on the theory that the three assailants were working to help Shannon Younger send a message to Wendy Vannauker. The defendant was a gang member, and other gang members had worked to intimidate Wendy. Her knowledge of Mr. Scott's gang connection explained why she refused to identify the assailants to police and why she feared for her life once she did so.

¶16 Defense counsel argued that the physical evidence was inconsistent with Jeramie's and Wendy's accounts of the melee. He also told them that there was no evidence that Mr. Scott was working in concert with Mr. Pourier or was otherwise responsible for Pourier's assault on Jeramie Vannauker. There also was no evidence that Mr. Scott was carrying out some plot on behalf of Shannon Younger.

¶17 The jury disagreed, finding the defendant guilty of all three charged counts. The trial court ultimately sentenced Mr. Scott to life in prison as a persistent offender on the two assault convictions. He then appealed to this court.

## ANALYSIS

¶18 This appeal raises several challenges. Because one issue is dispositive, we will not formally address the other[3] arguments, some of which might not arise during a retrial.[4]

■■ ¶19 Like membership in a church, social club, or community organization, affiliation with a gang is protected by our First Amendment right of association. *Dawson v. Delaware*, 503 U.S. 159, 117 L. Ed. 2d 309, 112 S. Ct. 1093 (1992). Therefore, evidence of criminal street gang affiliation is not admissible in a criminal trial when it merely reflects a person's beliefs or associations. *Id.* at 166-167. There must be a connection between the crime and the organization before the evidence becomes relevant. *Id.* at 166, 168.

¶20 Washington courts likewise have recognized the need for this connection before admitting evidence of gang membership. *State v. Johnson*, 124 Wn.2d 57, 67, 873 P.2d 514 (1994). Accordingly, to admit gang affiliation evidence there must be a nexus between the crime and gang membership. *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050, *review denied*, 128 Wn.2d 1004 (1995). Evidence of gang affiliation is considered prejudicial. *State v. Asaeli*, 150 Wn. App. 543, 574-578, 208 P.3d 1136 (2009). Admission of such evidence is measured under the standards of ER 404(b). *State v. Boot*, 89 Wn. App. 780, 788-790, 950 P.2d 964, *review denied*, 135 Wn.2d 1015 (1998); *State v. Yarbrough*, 151 Wn.

---

[3] We see no error in admitting the evidence of defendant's drug dealing and its relation to this offense. Similarly, the trial court did not err in declining to instruct the jury on the theory of defense of others.

[4] The allegations related to witness intimidation and an alleged conflict of interest need not be discussed here but can be presented to the trial court if those matters recur.

App. 66, 210 P.3d 1029 (2009). Evidence of other bad acts can be admitted under ER 404(b) when a trial court identifies a significant reason for admitting the evidence and determines that the relevance of the evidence outweighs any prejudicial impact. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). The balancing of these interests must be conducted on the record.[5] *Id.* at 832. The decision to admit or deny admission of ER 404(b) evidence is reviewed for abuse of discretion. *Id.* at 831. Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

¶21 Courts have regularly admitted gang affiliation evidence to establish the motive for a crime or to show that defendants were acting in concert.[6] *Yarbrough, supra*; *Boot, supra*; *Campbell, supra*. In each instance, there was a connection between the gang's purposes or values and the offense committed. In contrast, when there was no connection between a defendant's gang affiliation and the charged offense, admission of the gang evidence was found to be prejudicial error. *Asaeli, supra*; *State v. Ra*, 144 Wn. App. 688, 701-702, 175 P.3d 609, *review denied*, 164 Wn.2d 1016 (2008).

¶22 Here, the trial court identified proper bases for admitting the evidence. First, the evidence was admissible to show the motive behind the crime—to send a message to Wendy to repay her debts. The attack on Jeramie by three relative strangers was otherwise unexplainable. Second, the evidence could well have been admissible to show the connection between Mr. Scott and his codefendants, as well as the relationship of Mr. Younger to the attackers. This evidence reinforced the motive and also was arguably *res*

---

[5] The balancing on the record in this case was somewhat skimpy; a more complete statement of the trial court's reasoning is recommended at retrial.

[6] Evidence of concerted action is a basis for finding multiple individuals guilty for taking part in a single crime. *E.g., Lane*, 125 Wn.2d at 835 (three defendants were guilty of single act of murder even though only one defendant shot the victim).

*gestae* to explain the interactions of the various parties. *See Boot*, 89 Wn. App. at 790. Finally, the gang evidence also was admissible to explain the threats to Wendy and her refusal to initially identify the assailants. She knew that Mr. Scott was a gang member and feared him and his associates.[7]

¶23 While the offer of proof and the arguments of counsel suggested all of these proper reasons for admitting the gang evidence, the actual testimony presented fell far short of proving the connection between gang affiliation and the crime. The only person identified as a gang member was Mr. Scott. The record is utterly silent on whether any of the other actors were also members of the 18th Street gang. Thus, the evidence did not show that joint gang affiliation was a reason for the three men to attack Jeramie together or to explain why they would care whether Mr. Younger was not paid for the drugs he delivered to Wendy.

¶24 The evidence also did not connect to the expressed motive, which the trial court had required when it conditionally admitted the testimony. There was no evidence presented about the importance of "respect" in the gang culture or that violence was a recognized response to "disrespect," despite the prosecutor's promise that Detective Cantu would address the topic. Expert testimony on those topics has been presented in other cases to establish a gang's interest in violent retaliation. *E.g., Campbell*, 78 Wn. App. at 822 (noting expert testimony that gangs responded to disrespect with violence); *Yarbrough*, 151 Wn. App. at 79-80 (expert testimony on importance of respect and use of violence to respond to disrespect). The trial court expected similar testimony here. If the anticipated testi-

---

[7] One area where it is unclear if the gang evidence could be relevant involved the arrest. Testimony established that Mr. Scott was arrested in the company of a fellow 18th Street gang member as well as that of a rival gang member. No evidence showed that either gang was assisting Mr. Scott or that it furthered gang interests for Mr. Scott to evade arrest. Absent some testimony explaining why the gang evidence was relevant, it could be error to present that information at the retrial.

mony had been elicited, there would not have been any error. Instead, this situation is similar to that in *Ra*:

> And the State never presented evidence that Ra was a gang member and, if so, what the gang mores were. Without such evidence, we have no basis to conclude that the State's gang evidence was admissible under ER 404(b).

144 Wn. App. at 702.

¶25 The failure to connect the evidence likewise was error here. *Id.* The question remaining is whether or not the error was harmless. Evidentiary error can be harmless if, within reasonable probability, it did not materially affect the verdict. *State v. Zwicker*, 105 Wn.2d 228, 243, 713 P.2d 1101 (1986).

¶26 We are not convinced that standard is met here. The defense itself did present some evidence concerning gang activities, although that may have been to blunt some prosecution testimony that never arrived. Still, the evidence elicited at trial showed that only Mr. Scott, of the numerous actors in this affair, was a gang member. Without a connection of that status to the crimes, the only reasonable inference for the jury to draw from the testimony was that Mr. Scott was a bad person. One reason that ER 404(b) exists is to combat that type of reasoning. *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995). It is also very significant that the conviction for one of the assault charges was based on the theory of accomplice liability. Evidence of gang affiliation can be a basis for finding that multiple defendants were acting in concert. *Boot*, 89 Wn. App. at 790-793.[8] Here, the jury may well have thought that Scott was aiding Pourier as a fellow gang member seeking to further their gang's goals even though there was no evidence Pourier was in a gang or that the gang stood to profit from this incident. The failure to connect the gang evidence

---

[8] *Lane* involved three defendants committing a series of crimes together, but there was no indication that the three were involved in a street gang. The evidence of concerted activity was a basis for finding all three guilty of one murder actually committed by only one of the defendants. *Lane*, 125 Wn.2d at 835.

to support both the stated motive and as a basis for demonstrating concerted activity presents a significant probability that the error was not harmless. Most certainly it does not establish that the error most probably did not materially affect the verdict.

¶27 The dearth of gang evidence, whether through oversight or a commendable desire to limit the amount of prejudicial evidence presented to the jury, left the trial court without an evidentiary basis to support the gang affiliation evidence that was presented. The error has not been shown to be harmless.

¶28 The convictions are reversed and the case remanded for a new trial.

SCHULTHEIS, C.J., and SWEENEY, J., concur.

Review denied at 168 Wn.2d 1004 (2010).