**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>　　　　　　　Respondent,<br><br>　　　v.<br><br>MAXIMILIAN WILSON,<br><br>　　　　　　　Appellant. | No. 86742-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

MANN, J. — Maximilian Wilson appeals his convictions for two counts of second degree child rape. He argues that (1) there was insufficient evidence to conclude the rape charged in count two occurred within the charging period, (2) the State committed prosecutorial misconduct by eliciting prohibited expert testimony from child forensic investigator Alyssa Layne and misrepresenting testimony to the jury during closing argument, and (3) defense counsel was ineffective in failing to object to Layne's testimony and the State's closing argument. We affirm.

I

B.G. first met Wilson in 2017 through their church when she was 11 years old. Wilson was B.G.'s younger sister, L.G.'s Sunday school teacher. Wilson became a close family friend and spent a lot of time with the children. Wilson gave gifts to B.G.

and the other members of the family, including $300 in cash, a watch, laptop computers, and even lent B.G.'s father a Toyota Corolla when he needed a car. It was common for Wilson to take the children shopping for clothes and shoes, and he gave them allowances, provided they followed certain rules. The family could not have afforded these things without Wilson's support.

B.G.'s mother suffered from autoimmune hepatitis and required a life-saving liver transplant and treatment. B.G. would occasionally be home alone because her mother was at the hospital getting treatment, her father was at work, and her siblings were spending time away with friends. These occasions ranged from half an hour to several hours at a time. B.G. sometimes turned to Wilson for help with her homework when her parents were unavailable.

B.G. testified that the first time Wilson raped her she was home alone. Instead of doing her math homework, B.G. decided to clean her room. Once she started her math homework, B.G called Wilson for help given that she struggled with the subject. Because she was proud of her clean bedroom, when Wilson arrived, B.G. decided to show him. After Wilson praised B.G. for cleaning her bedroom, he pushed her into her bed, climbed on top of her, held her down, and vaginally raped her.

B.G. testified that Wilson raped her a second time at his apartment. On that occasion, B.G. and her siblings were at Wilson's place because her parents were on a date, and they needed someone to watch over them. B.G. testified that as they were watching a movie, she started feeling ill and went to the bathroom to throw up. Wilson followed B.G. to the bathroom and then took her to his bedroom so she could lie down. Once they were in the bedroom, Wilson climbed on top of B.G., removed her clothes,

and vaginally raped her, while her siblings were still watching the movie in the living room.

B.G. testified that both rapes happened in the same year, when she was 12 years old. After the incidents, B.G. missed two periods in her menstrual cycle and on the third month experienced heavy bleeding and "some of the worst pain [she had] ever felt." Afterward, B.G.'s period started once again. B.G. testified that after the two missed periods but before the heavy bleeding and intense pain, Wilson gave her a pregnancy test and then two white pills.

On March 27, 2022, B.G. confided in her Sunday school teacher that Wilson had raped her. B.G.'s teacher informed the church bishop. On March 29, 2022, B.G. met with her teacher and the bishop and B.G. went into more detail about the rapes. After the meeting, B.G.'s teacher notified the police. The police contacted B.G. and her family, and arranged an interview between B.G. and Alyssa Layne, a child forensic interviewer.

The State charged Wilson with two counts of rape of a child in the second degree. A jury found Wilson guilty as charged. Wilson appeals.

II

Wilson first argues that there was insufficient evidence to support the second rape charge. He asserts that because B.G. was equivocal about her age at the time of the rape, the State failed to prove beyond a reasonable doubt that the second rape took place within the timeframe charged. We disagree.

A

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1067 (1992). In a criminal case "all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

B

The charging period in count two was between November 9, 2017, and November 8, 2018. B.G. testified that both rapes occurred when she was 12 years of age. B.G.'s father testified that she was born on November 9, 2005, and B.G. testified that she turned 12 on November 9, 2017. While B.G. at one point in her testimony said that she was "probably 12," she later unequivocally said that she was 12 at the time.

We defer to the jury regarding conflicting testimony, credibility of witnesses, and persuasiveness of the evidence. Thomas, 150 Wn.2d at 874-75. We reject Wilson's invitation to substitute our own credibility determinations for those of the jury. Drawing all reasonable inferences in favor of the State, a reasonable trier of fact could have found that the rape in count two occurred within the charging period. The State produced sufficient evidence to support Wilson's conviction on the second rape charge.

III

Wilson then argues the State committed prosecutorial misconduct twice: by eliciting expert opinions during child forensic investigator Layne's testimony, and by misrepresenting facts to the jury in closing argument.

A

To prevail on a claim of prosecutorial misconduct, the defendant must establish "that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial." State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). If the defendant objected at trial, the defendant has the burden on appeal to show that the misconduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). But if no objection was raised, the defendant "is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. Additionally, when reviewing a claim of prosecutorial misconduct, we "review the statements in the context of the entire case." Thorgerson, 172 Wn.2d at 443.

B

Wilson first argues that the State committed prosecutorial misconduct when it elicited expert testimony from Layne in violation of the trial court's order in limine. We disagree.

-5-

Wilson moved pretrial to exclude all expert witness testimony because the State had not disclosed any experts. After the trial court asked whether Layne would be testifying, the State responded:

Ms. Layne will testify. I don't anticipate, frankly, even qualifying her as an expert. She will testify about what her practice is and how she interviewed—conducted this interview, but I don't anticipate asking her questions about, for instance, like veracity of statements or any of those particular issues. She's not endorsed as a memory expert here.

After the trial court asked whether the State opposed the motion in limine, the State responded, "[p]rovided that this is not a request to excluded Alyssa Layne at all, no objection." After Wilson confirmed that it was not, the court granted the motion.

In her testimony, Layne outlined the role of a child forensic interviewer, explained how she prioritizes open-ended questions for the purpose of obtaining the most accurate information, and how different variables, particularly age, affect the reliability of the information children provide. Wilson did not object to the questions nor testimony. At one point in the examination, the State asked Layne, "[i]n your education, training, and experience, what sort of factors play into how susceptible somebody would be to [suggestive content?]" Layne responded by explaining that the most significant variable would be age and that "the population we're most concerned about suggestibility are our preschool children, so age 3 and 4 to 5-year-olds."

Wilson contends that by calling on Layne's "education, training, and experience" in its questioning, the State elicited testimony that gave an impression of expertise

regarding suggestibility and memory source monitoring—in violation of the order in limine prohibiting expert testimony.

But because Wilson did not object to Layne's testimony, Wilson waived any error unless the State's conduct was so fragrant and ill intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at 760-61. Here, we agree with the State that had Wilson objected, and the trial court agreed, that the testimony was precluded by the order in limine, the line of questioning could have been stopped, and the jury could have been directed to disregard any of the expert testimony. Because Wilson failed to object, any error was waived.[1]

C

Wilson also argues that the State committed prosecutorial misconduct during closing argument by mischaracterizing the testimony of B.G.'s father. We disagree.

B.G.'s father testified that sometimes Wilson would take the children to the movies without either parent accompanying them. He stated that he and his wife "trusted [Wilson] that way." Wilson would take "whoever was at home" and wanted to go. B.G.'s father also stated that he "typically always made sure that—that no child was with [Wilson] all by [themselves,]" but acknowledged that there were times when he was at work and his wife was hospitalized or otherwise unable to supervise the children's activities. B.G.'s father didn't recall ever asking Wilson to babysit, but stated that his

_____

[1] Wilson notes that an exception to the objection requirement exists if where "an unusual circumstance exists 'that makes it impossible to avoid the prejudicial impact of evidence that had previously been ruled inadmissible.'" State v. Ra, 144 Wn. App. 688, 700, 175 P.3d 609 (2008) (quoting State v. Weber, 159 Wn.2d 252, 272, 149 P.3d 646 (2006). Examples of such unusual circumstances include questions "'in deliberate disregard of the trial court's ruling,' or 'an objection by itself would be so damaging as to be immune from any admonition or curative instruction by the trial court.'" Ra, 144 Wn. App. at 700-701 (quoting Weber, 159 Wn.2d at 272). Neither circumstance is present here.

wife may have done so. He also testified that Wilson was permitted to come over to the family's house to help B.G. with her math homework, and that there were times when he was working and his wife was either bedridden or at the doctor's and B.G. was "left to her own devices and on her own."

During closing argument, the prosecutor stated:

> The kids would spend time with [Wilson], without their parents. [B.G.'s father] told you that; [B.G.] told you that. Now [B.G.'s father] gave you some caveats, that, yeah, you know, he would prefer if all of the kids were together. But he also told you that [C.G.] was in and out with friends. He also told you that he wasn't always home. He told you that his wife was in really bad medical condition and couldn't always watch the kids. So, yeah, [Wilson] had time alone with those kids.

> And he told you, 'my wife could have asked [Wilson] to babysit; I'm not sure.' So he doesn't know all of those situations because some of it was his wife's decision.

> There were times that [Wilson] would babysit. There were times that [Wilson] would come over to help with homework. You heard that from [B.G.'s father] and from [B.G.]

Despite not objecting at the time, Wilson argues that the prosecutor's statements misstated B.G.'s father's testimony because key aspects of his testimony refuted B.G.'s testimony. But because Wilson did not object, he must show that the statements were so flagrant and ill intentioned that no instruction from the trial court could have cured any resulting prejudice. See Emery, 174 Wn.2d at 741. We agree with the State that the prosecutor's arguments were neither flagrant nor ill intentioned, but rather reasonable inferences from the testimony. Contrary to Wilson's argument, the testimony of B.G.'s father permitted an inference that Wilson babysat the children and had time alone with them.

Moreover, the court instructed the jury:

> The lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits. The law is contained in my instructions to you. You must disregard any remark, statement, or argument that is not supported by the evidence or the law in my instructions.

Juries are presumed to follow the trial court's instructions, absent evidence proving the contrary. State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007).[2] Even if the State's closing remarks mischaracterized the testimony, the jury was instructed to disregard them. And, had Wilson objected, the trial court could have re-read the instruction and cured any possible prejudice. Thus, Wilson fails to show the State's closing arguments constituted prosecutorial misconduct.

IV

Wilson next asserts that his trial counsel performed deficiently by failing to object to Layne's testimony, and by failing to object to the State's purported misrepresentation of facts during closing argument.

A

Criminal defendants are guaranteed the right to effective assistance of counsel pursuant to the Sixth Amendment of the United States Constitution and article I, section 22 of the Washington State Constitution. See U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). A claim of ineffective assistance of counsel presents a mixed question of law and fact that we review de novo. In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610

---

[2] The State reiterated the trial court's instruction during closing argument, confirming "nothing that I say . . . is evidence."

(2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant's case. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, L. Ed. 2d 674 (1984); Grier, 171 Wn.2d at 32-33. Failure to establish either prong is fatal to an ineffective assistance of counsel claim. Grier, 171 Wn.2d at 32-33.

Performance is deficient if it falls "below an objective standard of reasonableness." Grier, 171 Wn.2d at 33 (quoting Strickland, 466 U.S. at 669). "There is a strong presumption that counsel's performance was reasonable." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). A defendant may overcome this presumption by showing that "there is no conceivable legitimate tactic explaining counsel's performance." Grier, 171 Wn.2d at 33. But if counsel's conduct can be characterized as a legitimate trial strategy or tactic, then counsel's performance is not deficient. Grier, 171 Wn.2d at 33. To establish prejudice, the defendant must "prove that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." Kyllo, 166 Wn. 2d at 862.

B

Wilson argues that the failure of his trial counsel to object to Layne's testimony was ineffective assistance of counsel. Specifically, Wilson argues that "[d]espite prevailing on the motion in limine [barring all expert testimony,] his attorney failed to object to La[y]ne's improper expert testimony regarding susceptibility and memory." This, Wilson contends, "served no strategic purpose, and it prejudiced [his] trial." We disagree.

We presume that the failure to object was a function of legitimate trial strategy, and the burden is on Wilson to rebut this presumption. See In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). Wilson agrees that the trial court granted his motion in limine barring expert testimony, but not excluding Layne's testimony altogether. On that basis, Wilson's trial counsel may have decided not to object to testimony that he understood was not excluded by the motion in limine in the first place. Moreover, Wilson was able to cross-examine Layne and establish that she was not a fact finder, and that she was not assessing credibility "on a larger scale." Wilson's trial counsel may have decided that this cross-examination would be effective. Alternatively, Wilson's trial counsel may have not wanted to emphasize Layne's testimony with an objection. Regardless, Wilson has not rebutted the presumption that a strategic reason existed for his trial counsel not to object. Wilson fails to demonstrate that his trial counsel's decision not to object to Layne's testimony was deficient performance. Because Wilson fails to show that his trial counsel acted deficiently, we do not address prejudice.

C

Wilson further contends that the failure of his trial counsel to object during the State's closing remarks was ineffective assistance of counsel. We disagree.

The trial court instructed the jury that the lawyer's remarks, statements, and arguments are not evidence. The State reiterated the same in closing by stating that "nothing that I say . . . is evidence." Defense counsel may have decided not to object to the State's closing remarks because the trial court was unambiguous in its instructions to the jury, which were also echoed by the State. Wilson's argument that the failure to

-11-

object and secure a curative instruction from the trial court was deficient performance is not enough to rebut the presumption that trial counsel's actions were a function of legitimate trial strategy.  See Davis, 152 Wn.2d at 714.  "Lawyers do not commonly object during closing argument 'absent egregious misstatements.'"  Davis, 152 Wn.2d at 717 (quoting United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993)).  Wilson fails to show that his trial counsel's decision not to object to the State's closing argument constituted deficient performance.

We affirm.[3]

_Mann, J._

WE CONCUR:

_Chung, J._                                  _____, ACJ

---

[3] Wilson also argues that cumulative error below calls for reversal.  "The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial even where any one of the errors, taken individually, may not justify reversal."  In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012).  But "[t]he doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial."  Weber, 159 Wn.2d at 279.  Because we conclude that Wilson failed to show any error that affected the outcome of his trial, let alone an accumulation of errors, he is not entitled to reversal on that basis.