# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49534-1-II |
| Respondent, | |
| v. | consolidated with |
| ALEXANDER JABBAAR KITT, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 49555-4-II |
| Respondent, | |
| v. | |
| | and |
| JERMOHNN ELIJAH NATHANIEL GORE, | |
| Appellant. | |
| STATE OF WASHINGTON, | No. 49556-2-II |
| Respondent, | |
| v. | |
| | PUBLISHED IN PART OPINION |
| CLIFFORD JACARE KRENTKOWSKI, | |
| Appellant. | |

MELNICK, J. — The State alleged that on May 1, 2015, Alexander Kitt, Jermohnn Gore, Clifford Krentkowski, and three other men initiated a retaliatory drive-by shooting at a rival gang's territory in Tacoma. Law enforcement officers concluded their gunfire struck and killed Brandon Morris, who was unaffiliated with the rival gang but happened to be in the area. Kitt, Gore, and Krentkowski were jointly tried and convicted of murder in the first degree and four counts of

assault in the first degree. In addition, Kitt and Gore were convicted of unlawful possession of a firearm in the first degree, and Gore was convicted of intimidating a witness for threats he made before the trial.

In the published portion of this opinion, we reverse Krentkowski's conviction because his trial counsel had an actual conflict of interest that affected the representation, and the trial court erred by not allowing him to withdraw. In the unpublished portion of this opinion, we affirm the majority of Kitt's and Gore's convictions, but remand for the trial court to dismiss their murder in the second degree convictions with prejudice, conduct a *Miller*[1] hearing for Gore, and strike specific legal financial obligations (LFOs) for Kitt and Gore.

## FACTS[2]

I.  INCIDENT[3]

Kitt, Gore, and Krentkowski were all members of the Hilltop Crips street gang.

In the weeks before May 1, LeShaun Alexander, a member of the Knoccout Crips street gang, shot at some members of the Hilltop Crips, including Krentkowski. On the morning of May 1, Alexander shot at Kitt in the Tacoma Hilltop area outside the home of Trevion Tucker, another Hilltop Crips member.

A few minutes after the shooting, Gore called Tucker's house and said he intended to go look for the shooters. A group gathered in a white Cadillac Escalade, driven by fellow Hilltop

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[2] The following facts provide some background information and relate to the published portion of this opinion. Additional relevant facts will be related in the unpublished portion.

[3] Witnesses related the following events at trial.

2

Crips member Lance Milton-Ausley. The group included Milton-Ausley, Kitt, Gore, Krentkowski, and Tucker.

Kitt brought a backpack that contained two handguns. He kept one and gave the other to Gore. Kitt said he wanted to shoot Alexander. Krentkowski had an AK-47 semiautomatic assault rifle. The group planned to shoot at a convenience store, known as the "red store," in Knoccout territory where Knoccout members were known to gather. They planned to park somewhere near the store, get out, and shoot at it. They also planned to take pictures of themselves in Knoccout territory and post them on social media as a sign of disrespect to the rival gang.

As the group approached the red store, they noticed Alexander's car parked nearby. Milton-Ausley drove into the alley beside the red store. Alexander and several other Knoccout members were in a group near the store.

As soon as they pulled into the alley, Gore and Kitt began shooting in the direction of the store. Each of them fired one of Kitt's handguns. During the shooting, Milton-Ausley drove slowly down the alley. He accelerated away when the shooting subsided. Krentkowski had the assault rifle on his lap but did not shoot. Tucker testified that no one was aiming and none of them saw anyone get shot; they were "just shooting at the store." 14 Report of Proceedings (RP) at 2600.

That same day, Morris and four companions were walking in the alley behind the red store. A bullet fired from the Escalade struck Morris in the head and he died several days later. Another bullet struck a backpack worn by one of Morris's companions, but it did not injure him. None of the Knoccout members near the store was injured.

At the time of the shooting, Kitt was 23 years old, Gore was 16 years old, and Krentkowski was 17 years old.

3

The State charged Kitt, Gore, and Krentkowski each with one count of murder in the first degree and one count of murder in the second degree for the death of Morris. It also charged each of them with four counts of assault in the first degree, one for each of Morris's companions. It charged Kitt and Gore with unlawful possession of a firearm in the first degree and Gore with intimidating a witness. The case proceeded to a jury trial.

II.    CONFLICT OF INTEREST

At the start of trial, Walter Peale, Krentkowski's lawyer, informed the court about a conflict of interest. He stated that he had represented Alexander in an unrelated case, in which the court had granted Peale's motion to withdraw based on his representation of Krentkowski. Peale argued that Krentkowski should be advised about the conflict by an independent counsel before the case could proceed.

The State argued that there was no actual conflict because Alexander was not involved in the case other than that his "name may come up." 1 RP at 10. It explained that it would not be calling Alexander as a witness, but that the facts involved back-and-forth shootings between the Hilltop Crips and the Knoccout Crips and that Alexander was a "principal[] on the Knoccoutz side." 1 RP at 10.

The court ruled that no conflict existed that required withdrawal. It stated that, "[i]f they're totally unrelated matters, the representation of either Mr. Krentkowski or Mr. Alexander is not directly adverse to the other client." 1 RP at 31. The court recognized that a conflict would exist if there was "a significant risk that the representation of one or more clients will be materially limited by a lawyer's responsibility to another client, a former client or a third person or by a personal interest of the lawyer," but stated that it would "be surprised that a criminal defense attorney would have such a conflict" and that, even in that case, the rule allowed representation

4

"in certain circumstances." 1 RP at 31-32. The court said Peale could raise the issue again with additional citation to authority.

Several days later, Peale brought a motion to delay jury selection so that he could withdraw and Krentkowski could be appointed a new attorney or represent himself. Peale's motion raised his lack of preparation, his difficulties with the case, and the conflict of interest. The court denied the motion and stated that it had already ruled on Peale's motion to withdraw and substitute counsel. The court engaged in a colloquy with Krentkowski regarding self-representation. After conferring with Peale, Krentkowski withdrew his request to represent himself.

Peale raised the conflict of interest issue again the following day, after an independent counsel had reviewed the situation and opined that Peale had a conflict. The court stated that it had ruled on the issue and again denied Peale's motion to withdraw.

During its opening statement, the State told the jury that the evidence would show that Alexander had shot at Gore and Krentkowski a few days before the red store shooting. Peale then argued that the State had made Alexander a part of the case, "creat[ing] a relationship that [was] entirely different" from how the conflict had previously been explained. 4 RP at 710. He argued that his client was alleged to be the victim of his former client and that a central part of the State's case placed his clients at odds with one another, creating a "much greater risk of violating a variety of rules of professional responsibility." 4 RP at 711. Peale moved for a mistrial. The court denied Peale's mistrial motion and again denied his motion to withdraw.

During witness testimony, Peale raised the issue of his alleged conflict of interest two additional times. The first time, during Milton-Ausley's testimony, he stated that the case would require him to ask,

> [W]hat was in the mind of Mr. Alexander? What was his reputation? What was his character? What do I know about him that would offer up an explanation in

5

defense of Mr. Krentkowski? And why am I not pursuing that? And the reason I can't pursue it is because he's a former client.

8 RP at 1471. Peale argued that if evidence about Krentkowski and Alexander's interactions came in, he would be unable to respond due to his conflict of interest. The court delayed ruling until Peale had a chance to interview Tucker about his planned testimony.

After interviewing Tucker, Peale learned that Tucker intended to testify that Alexander was armed and present at the red store shooting and may have fired at Krentkowski. Peale suggested that the court exclude evidence of Alexander's involvement so he could continue representing Krentkowski despite the conflict. He argued that, otherwise, Tucker's testimony would "raise[] a considerable amount of information about [his] former client that in defense of [his] present client may be relevant to explore which [he couldn't] explore," preventing him from presenting a defense. 13 RP at 2372. The court denied Peale's motion.

At the conclusion of the trial, the jury returned guilty verdicts as to each count against all three defendants and found that each defendant was armed with a firearm during the commission of each murder and assault offense. The defendants appeal.

ANALYSIS

Krentkowski contends that he received ineffective assistance of counsel because the trial court denied his trial counsel's motion to withdraw based on a conflict of interest. He argues that, because an actual conflict of interest existed, we should presume prejudice and reverse his conviction. We agree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d. 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33; *State v. Linville*, 191 Wn.2d 513, 524, 423 P.3d 842 (2018). Representation is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland*, 446 U.S. at 688).

Effective assistance of counsel includes a duty of loyalty and a duty to avoid conflicts of interest. *State v. McDonald*, 143 Wn.2d 506, 511, 22 P.3d 791 (2001). To establish a Sixth Amendment violation based on a conflict of interest, "a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *State v. Regan*, 143 Wn. App. 419, 427, 177 P.3d 783 (2008). This requires the defendant to show "both that his attorney had a conflict of interest and that the conflict adversely affected counsel's performance." *State v. Reeder*, 181 Wn. App. 897, 909, 330 P.3d 786 (2014). If the defendant meets this two-part test, prejudice is presumed. *Reeder*, 181 Wn. App. at 909.

To show that the conflict adversely affected his lawyer's performance, the defendant must show that the conflict either "'cause[d] some lapse in representation contrary to the defendant's interests,'" or "'likely' affected particular aspects of counsel's advocacy on behalf of the defendant." *Regan*, 143 Wn. App. at 428 (quoting *State v. Robinson*, 79 Wn. App. 386, 395, 902 P.2d 652 (1995) and *United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992)). "[T]he *possibility* of a conflict [is] not enough to warrant reversal of a conviction." *State v. Dhaliwal*, 150 Wn.2d 559, 573, 79 P.3d 432 (2003).

7

We review a trial court's decision on a motion to substitute counsel for an abuse of discretion. *Reeder*, 181 Wn. App. at 908. However, whether the circumstances demonstrate a conflict under ethical rules is a question of law we review de novo. *Regan*, 143 Wn. App. at 428.

"An actual conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant." *State v. White*, 80 Wn. App. 406, 411-12, 907 P.2d 310 (1995). The matters alleged to be in conflict must be "substantially related." *State v. MacDonald*, 122 Wn. App. 804, 813, 95 P.3d 1248 (2004).

RPC 1.7(a) provides that a concurrent conflict of interest exists if "the representation of one client will be directly adverse to another client" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." RPC 1.9(c) prohibits a lawyer who has formerly represented a client from "us[ing] information relating to the representation to the disadvantage of the former client" except as the ethical rules would permit or require.

To determine whether an actual conflict exists, the trial court should perform a three-prong factual inquiry:

> "First, the court reconstructs the scope of the facts involved in the former representation and projects the scope of the facts that will be involved in the second representation. Second, the court assumes that the lawyer obtained confidential client information about all facts within the scope of the former representation. Third, the court then determines whether any factual matter in the former representation is so similar to any material factual matter in the latter representation that a lawyer would consider it useful in advancing the interests of the client in the latter representation."

*MacDonald*, 122 Wn. App. at 813 (quoting *State v. Hunsaker*, 74 Wn. App. 38, 44, 873 P.2d 540 (1994)).

8

In *White*, the defendant's lawyer had been appointed to represent a codefendant earlier in the case. 80 Wn. App. at 408-09. He reviewed the first client's file and police reports and recommended to the first client's relative that the first client should consider a guilty plea, but he never met with the first client. *White*, 80 Wn. App. at 408-09. Eleven days after his appointment, the lawyer was replaced. *White*, 80 Wn. App. at 409. Two weeks later, the court appointed the lawyer to represent White. *White*, 80 Wn. App. at 409. Neither party raised the conflict issue until after trial, when the lawyer noted in an affidavit that the police report from White's case had "seemed familiar" but he had not realized he had represented two codefendants until after it was brought to his attention. *White*, 80 Wn. App. at 409.

*White* concluded that the attorney had not "'actively' represented conflicting interests" because he "never directly communicated with [the codefendant]" and was not "privy to any confidences that could create an active conflict of interest." 80 Wn. App. at 412. There was "nothing in the record to support White's allegation that Appointed Counsel's allegiance to him was impaired." *White*, 80 Wn. App. at 412.

In *MacDonald*, the trial court disqualified the defendant's chosen defense lawyer because of a conflict of interest. 122 Wn. App. at 812. The disqualified lawyer had represented the victim's mother in an unrelated marital dissolution case. *MacDonald*, 122 Wn. App. at 812. Although the matters were completely unrelated, the court assumed the lawyer had received confidential information about the victim in the course of representing her mother. *MacDonald*, 122 Wn. App. at 813-14. This information "was relevant to [the victim's] credibility and, potentially, her current rape accusation." *MacDonald*, 122 Wn. App. at 814. Because the marital dissolution action "would have necessitated receiving information about" the victim, and her testimony was "the sole

evidence against" the defendant, a conflict existed and the lawyer could not represent the defendant. *MacDonald*, 122 Wn. App. at 814.

In *Dhaliwal*, the defendant's lawyer had represented several witnesses who testified at trial. 150 Wn.2d at 564. The representation of the witnesses occurred both prior to and during the defendant's case. *Dhaliwal*, 150 Wn.2d at 564-65. The trial court asked the lawyer about his representation of the witnesses and the lawyer said there was no conflict. *Dhaliwal*, 150 Wn.2d at 565. Dhaliwal never objected and he said he wanted the lawyer to continue representing him. *Dhaliwal*, 150 Wn.2d at 565. The other representation involved a shareholder action which may have been related to the motive for the murder at issue in the case. *Dhaliwal*, 150 Wn.2d at 572.

*Dhaliwal* focused on the lawyer's actual performance at trial and concluded that Dhaliwal showed "the possibility that his attorney was representing conflicting interests," but "failed to establish an actual conflict because he ha[d] not shown how [his lawyer's] concurrent representation of the witnesses . . . affected [his] performance at trial." 150 Wn.2d at 573. Dhaliwal did not show a "strong possibility that a conflict of interest had an effect on [his lawyer's] performance." *Dhaliwal*, 150 Wn.2d at 574.

In this case, Peale repeatedly raised a conflict of interest based on his representation of a rival gang member. Trial testimony established that Alexander had shot at Kitt the morning of the shooting and had shot at Krentkowski a few weeks prior. Alexander was one of the intended targets of the red store shooting. Peale said that the State's case raised a considerable amount of information about Alexander that may be relevant to his defense of Krentkowski, but that he could not explore this information because of his ongoing duty to Alexander.

We accept Peale's representations that he learned confidential information in his representation of Alexander that he could not use to defend Krentkowski. Although Peale no

longer represented Alexander at the time of trial, RPC 1.9(c)(1) prohibited him from using any confidential information he had obtained in his representation of Krentkowski. Peale raised numerous issues that could have been helpful to his defense of Krentkowski that he could not explore due to his ongoing duty to Alexander, such as Alexander's reputation and character and his relationship to Krentkowski. He was unable to pursue a defense relying on this information because Alexander was his former client.

This case bears similarities to *Dhaliwal*, where the attorney represented numerous witnesses in the case. However, unlike in *Dhaliwal*, Peale raised the conflict numerous times before the trial court, repeatedly claiming that an actual conflict existed. Additionally, an independent counsel spoke with Krentkowski and concluded that Peale had a conflict of interest.

Peale had an actual conflict of interest that affected his defense of Krentkowski. He repeatedly informed the trial court of this conflict and stated that the conflict would limit his representation of Krentkowski throughout the trial. We conclude that Krentkowski received ineffective assistance of counsel. In so ruling, we are mindful that the lawyer made numerous motions to withdraw due to the conflict, and the court denied all of them. Although Krentkowski couches his argument as ineffective assistance of counsel, the true error is in the court's failure to grant the motions to withdraw. We reverse Krentkowski's convictions.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

ADDITIONAL FACTS

## I. WITNESS INTIMIDATION

The same juvenile detention facility housed Gore and Tucker pending trial. A no-contact order prevented Gore from being near Tucker's cell.

Before trial, Gore sent Tucker a note that said, "Please don't snitch. Take your statement back or were [sic] gonna kill your family." Clerk's Papers (CP) at 40. The court admitted the note into evidence and the jury saw it. Immediately after admitting the note, the court read a limiting instruction to the jury that said,

> [E]vidence of an alleged threat allegedly made by Defendant Jermohnn Gore, . . . [is] being admitted for a limited purpose. Any evidence related to this alleged threat may only be considered by you as evidence against Jermohnn Gore and may not be used as evidence against any other defendants, including Alexander Kitt and Clifford Krentkowski.

12 RP at 2301.

## II. JOINDER

The State moved to join Kitt, Gore, Krentkowski, and two other defendants' cases for trial. None of the defendants objected to joinder. The court joined the cases.

At the start of trial, the State filed an amended information, charging Gore with the additional crime of intimidating a witness based on the note he sent to Tucker. Kitt moved for severance in light of the witness intimidation charges against Gore. He argued that the jury would interpret the note's reference to "we" to mean all of the defendants, not just Gore.

The parties and the trial court addressed the motion as a *Bruton*[4] issue, concerning the admissibility of out-of-court statements by non-testifying codefendants. The State contended that

---

[4] *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968).

*Bruton* did not apply and that, to the extent the note prejudiced Kitt, it could be remedied by a limiting instruction which the court ultimately gave.

The court ruled that the note was not a "testimonial statement" or "confession" by Gore that implicated either of the other two defendants. It stated that the issue could be dealt with "by use of a limiting instruction that specifically limit[ed] the use of th[e] note for the purpose of Mr. Gore's state of mind" and for the intimidating a witness charge. 2 RP at 252.

At the conclusion of the witness intimidation evidence against Gore, Kitt renewed his motion to sever and the court again denied it.

III.     SUPPRESSION MOTION

Four days after the shooting, Kitt had a scheduled appointment with his probation officer. Kitt arrived at his appointment in a Cadillac DeVille driven by Gore's father, Jermaine Gore. Gore and another man also occupied the DeVille. The police were waiting for Kitt at the appointment location and arrested him.

The police approached the DeVille, questioned its occupants, and ultimately arrested all of them and impounded the DeVille.[5] The record is unclear as to whether police performed a *Terry*[6] stop of the vehicle or approached the occupants for voluntary questioning. The record does not clarify on what basis police approached the DeVille, nor whether they had reasonable suspicion or probable cause of any crime involving the DeVille. Three days after impounding the DeVille,

---

[5] Kitt alleged in an evidence suppression motion that "[w]hen [he] arrived and exited the vehicle he was immediately arrested as were the passengers and the [vehicle]." CP at 151. Per testimony at trial, Kitt had left the vehicle and entered the building for his appointment before police approached the DeVille.

[6] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

police acquired a search warrant for it based largely on information obtained from questioning Gore. The police searched the DeVille and found the guns used in the shooting.

Kitt moved to suppress the seized evidence and Gore and Krentkowski joined his motion. Kitt argued that, because the police did not have probable cause to arrest him on May 5, the items seized from the DeVille in the execution of the warrant must be suppressed. He argued that all evidence seized from the DeVille was fruit of the original unlawful arrest.

The court questioned the relationship between the allegedly unlawful arrest of Kitt and the search of the DeVille and stated they were "two totally different things." 2 RP at 274. Kitt responded that they were related because the police were looking for him and seized the DeVille as part of his arrest. Kitt claimed that his unlawful arrest led to the seizure, the issuance of the warrant, and the search of the DeVille.

The court denied the suppression motion, but allowed Kitt to provide additional authority and explain the connection between Kitt's arrest and the evidence seized pursuant to the warrant. The court declined to hold an evidentiary hearing and ordered the State to prepare a written order setting forth its reasons for doing so. Our record on appeal contains no such order.

In supplemental briefing before the trial court, Kitt did not draw any connection between Kitt's allegedly unlawful arrest and the issuance and execution of the warrant for the DeVille. Rather, Kitt argued that no probable cause existed for his arrest or for seizure of the DeVille and claimed that, therefore, the evidence later seized pursuant to the warrant must be suppressed. He argued all evidence seized from the DeVille was fruit of the poisonous tree.

The court again denied Kitt's motion, concluding that, even if probable cause did not exist to arrest Kitt, there was no causal relationship between his arrest and the execution of the warrant

14

to search the DeVille three days later. It declined to order an evidentiary hearing and did not enter any written order regarding this ruling.

## IV. GANG-AFFILIATION EVIDENCE

The defendants moved to exclude "other bad acts" evidence under ER 404(b), including evidence of their gang affiliation.

The trial court utilized the four-part test for determining admissibility of ER 404(b) evidence. It found that the gang evidence had been established by a preponderance of the evidence, was clearly relevant to prove a motive for the shooting, and explained why the shooting happened. The court found the evidence explained "why all of those particular people were in that specific car at the time that the shooting took place." 2 RP at 226. It concluded the evidence was "clearly more probative than prejudicial" and allowed its admission. 2 RP at 226.

## V. UNLAWFUL FIREARM POSSESSION EVIDENCE

When trial began, the court permitted the State to amend the information to add one count of unlawful possession of a firearm in the first degree and one count of intimidating a witness against Gore. Gore asked which firearm he was alleged to have possessed, and the State responded,

> I think counsel is aware that there is evidence that a .40 caliber semiautomatic pistol and a 9mm semiautomatic pistol were used in this event, and there's evidence that an assault rifle was possessed by individuals in the car during the course of this event, so it would be any one of those three firearms.

2 RP at 264.

At trial, the State presented evidence that two handguns and an assault rifle were in the Escalade at the time of the shooting. Kitt provided Gore one handgun and kept another for himself, and they each fired out of the car as they drove past the red store. Krentkowski had the assault rifle on his lap, but he did not fire it. A witness testified that he had seen Gore with the assault

15

rifle in the past. Milton-Ausley testified that, when he picked up Gore and Krentkowski, Gore had a guitar bag containing the assault rifle.

The State also presented evidence that, when it executed the search warrant on the DeVille, it recovered a guitar case containing a semiautomatic rifle and three handguns, two of which were in a backpack. The rifle and the two handguns in the backpack were identical to the types used in the shooting.

In closing arguments, the State argued that the defendants collectively "had their guns ready, two firearms in a backpack, an AK-47 . . . in a guitar case." 18 RP at 3506. The State emphasized that Gore "had the AK-47. It is not just, [o]h, Mr. Gore walks around town with an AK-47. . . . It was in a car, in a Cadillac DeVille with his father Jermaine, Sr. with two other firearms with a backpack a few days after the incident. The AK was in there. The AK was brought into the Cadillac Escalade that morning for a purpose." 19 RP at 3661.

VI.    EYEWITNESS EVIDENCE

Defense witness Amber Fetcher was in her home near the red store and heard two gunshots near the time of the shooting. She looked out her window and saw "a blue Corsica with a young black male hanging out the passenger side window with a gun in his hand" and then heard seven or eight more gunshots. 17 RP at 3235. She said she did not see any other vehicles or persons with weapons. She heard many gunshots, but did not see the person in the Corsica fire his weapon. She could not tell if anyone was firing from the alley.

Fetcher was unable to identify whether a vehicle in security camera footage was the vehicle she described. She said the Corsica did not enter the alley that the Escalade was alleged to have shot from, but was near the corner where the alley met the street.

16

Morris's four companions each testified and described the shooter's vehicle. Three of them described it as a white sport utility vehicle (SUV). Another described it as an SUV that he at first thought was white, then "tan-ish silver-ish gold." 7 RP at 1265. Numerous additional eyewitnesses identified the shooters' vehicle as a white SUV.

Security camera evidence showed a white SUV drive down the alley. Forty seconds later, the same camera showed a blue sedan drive past the alley without turning down it. Another security camera video showed two Knoccout members near the red store possibly holding weapons immediately after the shooting.

One of Morris's companions testified that he heard a single shot before the rapid fire shots began. He testified he did not know where it came from.

Tucker testified that he saw Alexander and other Knoccout members near the red store, but did not see guns in their hands and did not see any of them pull out a gun. Milton-Ausley and Tucker both testified that Gore and Kitt immediately began shooting as soon as they pulled into the alley. Tucker had told police in an interview that he saw Alexander holding a gun but did not believe he fired it. Tucker testified that the Knoccout members near the store did not shoot at their car.

VII.    JURY INSTRUCTIONS

Kitt proposed a self-defense jury instruction, arguing that the Knoccout members near the store had fired first and any shots the defendants fired were in self-defense. His proposed instruction mimicked WPIC 16.02:[7]

> It is a defense to a charge of murder and/or manslaughter that the homicide was justifiable as defined in this instruction.

---

[7] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 16.02, at 234 (3d ed. 2008).

Homicide is justifiable when committed in the lawful defense of the slayer or another in the slayer's presence or company when:

1) the slayer reasonably believed that the person slain or others whom the defendant reasonably believed were acting in concert with the person slain intended to commit a felony to inflict death or great personal injury;

2) the slayer reasonably believed that there was imminent danger of such harm being accomplished; and

3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to him or her, at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

CP at 242.

The court stated that the "the only evidence in this entire case that I heard that even comes remotely close" to showing self-defense was Fetcher's testimony that she heard two shots, then saw a blue Corsica driving by the alley with a young black male with a gun hanging out of it. 17 RP at 3462. It noted that this happened "a considerable period of time after the white SUV had already driven down the alley" and that other testimony suggested that "the first couple of shots hit the ground and the dirt flew up" when the SUV first entered the alley. 17 RP at 3462.

The court ruled:

I will not be giving an instruction on self defense. First, it is illogical to require the State to prove the absence of self defense beyond a reasonable doubt but not give the State notice of such a defense until the end of the fourth week of trial. Second, there is no credible evidence that the occupants of the Cadillac Escalade reasonably believed that Brandon Morris, or anyone whom the defendants reasonably believed were acting in concert with Brandon Morris, intended to inflict death or great personal injury.

CP at 256.

No party proposed a unanimity instruction requiring the jury to ensure its verdict was unanimous as to which gun Gore or Kitt possessed for the unlawful possession of a firearm charge.

18

VIII.   JUROR

After trial, the court presented each juror with a certificate of appreciation. Juror 11 noticed that the middle initial was incorrect and realized that the summons for jury duty he had received had been intended for his son. They shared a first and last name. The jury summons included a first and last name, but did not include a middle initial. Juror 11's son lived with him at some point, but at the time of the end of trial, his son had moved to California. The record is unclear as to whether the son lived with Juror 11 at the time Juror 11 received the summons.

Kitt moved for a new trial on the basis of an unconstitutional volunteer juror. Gore and Krentkowski joined in Kitt's motion. After a fact-finding hearing, the trial court found that Juror 11 received a summons and had no reason to believe it was not intended for him, as the summons did not include a middle initial. It stated that Juror 11 was "certainly inquired of during the voir dire process" and "otherwise qualifie[d] to be a juror." RP (sentencing) at 103. The court concluded there had not been any juror misconduct and, if there had been, that it would not have changed the outcome. It denied the motion for a new trial.

IX.   SENTENCE

The court dismissed the guilty verdicts for murder in the second degree as to each defendant without prejudice, citing double jeopardy concerns. At sentencing, Kitt objected to this action and requested that these counts be dismissed with prejudice. The court noted the objection but did not respond to it.

A.   KITT

The court sentenced Kitt to a standard-range sentence of 338 months for the murder, 93 months on each assault, and 77 months for unlawful possession of a firearm. It additionally sentenced him to 60 months on each firearm enhancement. The court ordered that each of the

19

murder and assault counts, as well as their firearm enhancements, would run consecutively for a total sentence of 1,010 months.

The court found Kitt indigent, waived discretionary fines and costs, and imposed a $500 crime victim assessment, a $200 criminal filing fee, and a $100 DNA (Deoxyribonucleic acid) collection fee.

Kitt was 23 years old at the time of the murder and the court did not discuss or address his youthfulness.

B.    GORE

Gore was 16 years old at the time of the murder. Gore raised his youthfulness as a factor to be considered in his sentence and requested that "the juvenile mind development" be taken into consideration. RP (sentencing) at 162. He did not specifically request a downward departure on that basis. The State cited *Miller v. Alabama*[8] and the *Miller*-fix[9] statute and stated that Gore would be eligible for early release in 20 years, regardless of the sentence the court imposed.

The court noted that criminal sentences for juveniles are more intended to "hopefully reform people" but stated that "there's a reason why we decline youth at a certain age with a certain charge and treat them as adults despite the whole issue with the lack of full brain development." RP (sentencing) at 169. It stated that it did not see Gore's youthfulness as a basis to differentiate Gore from Kitt and imposed an equivalent sentence, taking into account the differences in Kitt's and Gore's criminal histories and standard ranges.

The court sentenced Gore to a standard-range sentence of 312 months for the murder, 93 months for each assault, 77 months for the unlawful possession of a firearm, and 67 months for

---

[8] 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[9] RCW 10.95.030.

20

intimidating a witness. It ran the murder and assault sentences consecutive and consecutive to the five 60-month firearm enhancements for a total sentence of 984 months.

The court found that Gore was indigent and waived discretionary costs, but assessed a $500 victim assessment, a $200 criminal filing fee, and a $100 DNA collection fee.

ANALYSIS[10]

I.     SUFFICIENCY OF EVIDENCE – ASSAULT

The defendants contend that the State failed to prove beyond a reasonable doubt that they intended to cause anyone great bodily harm. They claim that sufficient evidence does not support the four convictions of assault in the first degree. We disagree.

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). In claiming insufficient evidence, "the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Drum*, 168 Wn.2d 23, 35, 225 P.3d 237 (2010). Any inferences "'must be drawn in favor of the State and interpreted most strongly against the defendant.'" *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)).

To convict the defendants of assault in the first degree, the jury had to find beyond a reasonable doubt:

> (1) That on or about May 1, 2015, defendant [individual defendant] or an accomplice assaulted [victim];
> (2) That the assault was committed with a firearm;

---

[10] We reversed Krentkowski's conviction in the published portion of this opinion, but must still decide whether sufficient evidence supports his conviction. The unpublished portion of our analysis applies primarily to Kitt and Gore, but the sufficiency of the evidence analysis applies to Krentkowski as well.

21

(3) That defendant [individual defendant] or an accomplice acted with intent to inflict great bodily harm; and

(4) That this act occurred in the State of Washington.

CP at 334-45; RCW 9A.36.011. The State charged each defendant with four counts of assault in the first degree, one for each of Morris's companions. The defendants contend that the State failed to present sufficient evidence as to the third element, that they "acted with intent to inflict great bodily harm."

"Assault in the first degree requires a specific intent; but it does not, under all circumstances, require that the specific intent match a specific victim." *State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994). Once intent to inflict great bodily harm is established, the mens rea may be transferred to any unintended victim. *State v. Elmi*, 166 Wn.2d 209, 218, 207 P.3d 439 (2009).

The evidence showed that the defendants traveled to the red store with the intent to either disrespect their rival gang by taking pictures of their territory, or to shoot at them in retaliation for other recent shootings. It further showed that Kitt and Gore both fired handguns repeatedly toward the red store and a group of rival gang members as Milton-Ausley drove past. Krentkowski sat in the car with an assault rifle on his lap and took part in planning the assault.

A fellow gang member who was with the defendants at the time of the shooting testified that they were looking for the car that had shot at them that morning to "shoot at them" because "they keep shooting at us." 13 RP at 2440. The same person also testified that they shot at the store without aiming. Another gang member testified that Kitt said he wanted to shoot Alexander.

In a sufficiency of evidence challenge, we draw all reasonable inferences in favor of the State. Where the State produced evidence that the defendants planned to shoot at their gang rivals and did shoot at them as they drove past, a reasonable juror could infer that the defendants intended

22

to inflict great bodily harm. This intent to inflict great bodily harm may then be transferred to the victims. Sufficient evidence supports the convictions for assault in the first degree.

## II. GANG AFFILIATION EVIDENCE

The defendants contend that the trial court erred by admitting evidence of their gang affiliation. They claim that the trial court abused its discretion by admitting the evidence in this case because the State failed to show a nexus between the gang evidence and the crime. We disagree.

ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"If the evidence is admissible for one of these purposes, a trial judge must determine whether the danger of undue prejudice from its admission outweighs the probative value of the evidence." *State v. Jackson*, 102 Wn.2d 689, 693, 689 P.3d 76 (1984).

We review a "trial court's decision to admit or deny evidence of a defendant's past crimes or bad acts under ER 404(b) for an abuse of discretion." *State v. Fuller*, 169 Wn. App. 797, 828, 282 P.3d 126 (2012). "A trial court abuses its discretion by not following the requirements of ER 404(b) in admitting evidence of a defendant's prior convictions or past acts." *Fuller*, 169 Wn. App. at 828. A trial court also abuses its discretion if its decision is manifestly unreasonable, meaning it falls outside the range of acceptable choices, given the facts and the applicable legal standard, its decision is based on untenable grounds, meaning its factual findings are unsupported by the record, or its decision is 'based on untenable reasons, meaning it applied an incorrect legal standard. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

23

When a trial court admits evidence under ER 404(b), it must "'(1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence.'" *Fuller*, 169 Wn. App. at 828-29 (quoting *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009)).

"Like membership in a church, social club, or community organization, affiliation with a gang is protected by our First Amendment right of association. Therefore, evidence of criminal street gang affiliation is not admissible in a criminal trial when it merely reflects a person's beliefs or associations." *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009) (internal citation omitted). "There must be a connection between the crime and the organization before the evidence becomes relevant." *Scott*, 151 Wn. App. at 526.

However, "[c]ourts have regularly admitted gang affiliation evidence to establish the motive for a crime or to show that defendants were acting in concert." *Scott*, 151 Wn. App. at 527. When there is a "connection between the gang's purposes or values and the offense committed," the evidence is admissible, whereas "when there [is] no connection between a defendant's gang affiliation and the charged offense," admission of gang evidence is prejudicial error. *Scott*, 151 Wn. App. at 527.

In this case, the trial court stated the evidence was relevant "for purposes of motive, why this happened, and why all of those particular people were in that specific car at the time that the shooting took place." 2 RP at 226. The court balanced on the record the prejudicial effect of the evidence against its probative value, and ruled that it was clearly more probative than prejudicial.

The evidence showed that Alexander, a Knoccout, shot at Kitt, Krentkowski, Tucker, and other Hilltop Crips multiple times in the weeks leading up to the crime. The defendants traveled to the red store, located in Knoccout territory, to either shoot at them or take pictures of their territory as a sign of disrespect. Kitt and Gore began shooting at the red store when they saw Alexander's car parked there and Alexander and other Knoccout members outside the store.

The gang affiliation evidence was relevant to explain the motive for the shooting, the rivalry between the defendants and their intended targets, and the facts that led up to the shooting. The evidence in this case demonstrated a "connection between the gang's purposes or values and the offense committed." *Scott*, 151 Wn. App. at 527. The trial court did not abuse its discretion by concluding that the gang affiliation evidence was more probative than prejudicial in this case.

III.    JUROR

The defendants contend that the court's seating of Juror 11, who had responded to his son's summons for jury duty, created a "volunteer juror" which destroyed the randomness of the jury selection process in violation of Washington's jury selection statute. Br. of Appellant (Kitt) at 23. They claim that, because the error in this case created a "material departure" from Washington's juror selection statute, prejudice should be presumed and their convictions should be overturned. Br. of Appellant (Kitt) at 28. We disagree.

"The purpose of article I, section 22 of the Washington State Constitution is to guarantee a fair and random selection of jurors from the county in which a crime is alleged to have been committed." *City of Tukwila v. Garrett*, 165 Wn.2d 152, 155, 196 P.3d 681 (2008). RCW 2.36.080(1) provides that "all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court." "A randomly selected jury is a

right provided by statute and is based on the Legislature's policy of providing an impartial jury." *State v. Tingdale*, 117 Wn.2d 595, 600, 817 P.2d 850 (1991).

A person is competent to be a juror in Washington unless he or she (1) is less than eighteen years old, (2) is not a citizen of the United States, (3) is not a resident of the county, (4) is unable to communicate in English, or (5) has been convicted of a felony and not had civil rights restored. RCW 2.36.070.

The statutory requirements for making jury lists are "merely directory and need be only substantially complied with." *Garrett*, 165 Wn.2d at 159. "As long as the method chosen preserves the element of chance in selection of the panel, it has been found to be proper." *Tingdale*, 117 Wn.2d at 600. Where the trial court substantially complies with the applicable statutes, the defendant must show prejudice. *Tingdale*, 117 Wn.2d at 600. However, if the trial court materially departs from the statutes, prejudice is presumed. *Tingdale*, 117 Wn.2d at 600.

The trial court may grant a new trial on the basis of "[m]isconduct of the prosecution or jury" or "[i]rregularity in the proceedings of the court, jury or prosecution." CrR 7.5(a). We review a trial court's ruling on a motion for a new trial based on juror misconduct for an abuse of discretion. *State v. Gaines*, 194 Wn. App. 892, 896, 380 P.3d 540 (2016).

In this case, Juror 11 responded to a jury summons intended for his son, with whom he had recently lived. They shared a first and last name. The jury summons did not include a middle initial, preventing Juror 11 from knowing to whom the summons was directed. Juror 11 realized that the summons had been intended for his son only after the trial, when the court provided him with a certificate of appreciation that included a middle initial.

26

The trial court found that Juror 11 had "no reason to believe" that the summons was not directed to him. RP (sentencing) at 103. Juror 11 was "inquired of during the voir dire process" and was "otherwise qualifie[d] to be a juror." RP (sentencing) at 103. The court ruled that Juror 11 had not committed juror misconduct and that it saw no reason to set aside the jury verdict and grant a new trial.

Kitt characterizes Juror 11 as a "volunteer juror" which is prohibited by RCW 2.36.080's requirement that jurors be selected randomly. However, Juror 11 did not "volunteer" to sit on the jury; he believed he was responding to a jury summons. Under the circumstances of this case, that belief was reasonable. The court sent the summons to his address. No further identifying information other than a first and last name appeared on the summons. Additionally, nobody questioned Juror 11's competency to sit as a juror under RCW 2.36.070. Nothing suggests Juror 11 committed any misconduct, or that the County erred in following procedures for assembling a valid jury pool. The procedures in this case "preserve[d] the element of chance in selection of the panel." *Tingdale*, 117 Wn.2d at 600. The trial court did not abuse its discretion by denying a new trial on this issue.

IV.     VEHICLE SEIZURE

The defendants contend that police did not have probable cause to seize the DeVille in which Kitt arrived for his probation appointment four days after the shooting. They claim that, because police lacked probable cause for the seizure, all evidence taken from the DeVille should have been suppressed. They also contend that the trial court erred by failing to hold an evidentiary

hearing on this issue and failing to explain its reasons for not holding an evidentiary hearing in writing. Given the inadequacies in the record, we are unable to effectively review this issue.[11]

When a trial court receives a motion to suppress evidence, it must determine whether an evidentiary hearing is required. CrR 3.6(a). If it determines that no evidentiary hearing is required, it must "enter a written order setting forth its reasons." CrR 3.6(a).

If law enforcement has probable cause to search a vehicle, it may seize it and deny access to it for a reasonable time while obtaining a search warrant. *State v. Campbell*, 166 Wn. App. 464, 472, 272 P.3d 859 (2011). To seize a vehicle under this exception, police must "have probable cause to believe it contains contraband or evidence of a crime." *State v. Houser*, 95 Wn.2d 143, 149, 622 P.2d 1218 (1980).

Kitt moved to suppress evidence stemming from his allegedly unlawful arrest. His arguments focused on whether probable cause supported his arrest and he did not explain the connection between that arrest and the seizure of the DeVille.[12]

The trial court did not hold an evidentiary hearing because it believed it could deny Kitt's suppression motion on a purely legal issue. It concluded that any evidence seized from the DeVille was seized pursuant to a valid and unchallenged warrant because the defense had not shown any connection between Kitt's arrest and the issuance of the warrant. Any deficiencies in the probable cause for Kitt's arrest were unrelated to evidence seized from the DeVille pursuant to the unchallenged warrant.

---

[11] Because review of this issue would necessitate consideration of facts outside the record, the appropriate means of review would be through a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

[12] Kitt argued that the DeVille's seizure was incident to Kitt's unlawful arrest, but this argument appears factually inaccurate because Kitt was neither near the DeVille when he was arrested nor when police first approached the DeVille.

Now, on appeal, Gore's suppression arguments focus exclusively on an alleged stop and subsequent impoundment of the DeVille prior to police obtaining the search warrant. Without an evidentiary hearing or written order, the record is insufficient for us to determine the legality of the officers' interaction with the DeVille and its occupants. The record contains no facts explaining what led police to approach the DeVille, or on what basis they had it impounded pending the search warrant. The record does not contain these facts because the theory of suppression argued on appeal is distinctly different from the one argued at trial.

The trial court in this case erred by failing to enter a written order stating its reasons for denying an evidentiary hearing. We are unable to review the present issue because the parties did not argue it below and the record provides no detail about the officers' bases for the initial stop or impoundment of the DeVille.

## V. UNANIMOUS JURY VERDICT

Gore contends that his right to a unanimous jury verdict was violated as to his unlawful possession of a firearm conviction. He claims that the State presented evidence that he possessed multiple firearms and the court did not provide a unanimity instruction, such that different jurors could have voted to convict based on Gore's possession of different firearms.[13] We disagree.

"In Washington, a defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed." *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988), *abrogated in part on other grounds by In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 316 P.3d 1007 (2014). "When the evidence indicates that several distinct criminal

---

[13] Kitt adopts this argument as well. However, Gore's arguments on this issue are factually specific to him and make little sense as applied to Kitt. We address this argument as to Gore only.

29

acts have been committed, but [the] defendant is charged with only one count of criminal conduct, jury unanimity must be protected." *Petrich*, 101 Wn.2d at 572. In order to protect jury unanimity, the State must either identify one specific act it intends to rely on as the crime charged, or the court must give the jury a *Petrich* instruction, "explaining that all '12 jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt.'" *State v. McNearney*, 193 Wn. App. 136, 140, 373 P.3d 265 (2016) (quoting *Petrich*, 101 Wn.2d at 572). "'[F]ailure to follow one of these options is error, violative of a defendant's state constitutional right to a unanimous jury verdict and United States constitutional right to a jury trial.'" *McNearney*, 193 Wn. App. at 140-41 (quoting *Kitchen*, 110 Wn.2d at 409).

Failure to give a unanimity jury instruction is a manifest constitutional error that may be raised for the first time on appeal. *State v. Moultrie*, 143 Wn. App. 387, 392, 177 P.3d 776 (2008).

"A multiple acts unanimity instruction is not required when the State presents evidence of multiple acts that indicate a 'continuing course of conduct.'" *State v. Locke*, 175 Wn. App. 779, 803, 307 P.3d 771 (2013) (quoting *State v. Crane*, 116 Wn.2d 315, 326, 804 P.2d 10 (1991)). "'A continuing course of conduct requires an ongoing enterprise with a single objective.' To determine whether multiple acts constitute a continuing course of conduct, we evaluate the facts in a commonsense manner." *Locke*, 175 Wn. App. at 803 (internal citation omitted) (quoting *State v. Love*, 80 Wn. App. 357, 361, 908 P.2d 395 (1996)).

"Washington courts have found a continuing course of conduct in cases where multiple acts of the charged crime were committed with a single purpose against one victim in a short period of time." *Locke*, 175 Wn. App. at 803.

In *Love*, police found drugs on the defendant's person, then executed a search warrant at his residence and found additional drugs, guns, a large sum of money, and other drug delivery paraphernalia. 80 Wn. App. at 359. The State charged Love with one count of possession of a controlled substance with intent to deliver. *Love*, 80 Wn. App. at 358. On appeal, Love argued that the jury should have received a unanimity instruction, because of the distinct drugs found on his person and those found at his residence. *Love*, 80 Wn. App. at 360.

The court concluded that no unanimity instruction was required because Love's possession of the drugs on his person and at his residence reflected "his single objective to make money by trafficking cocaine; thus, both instances of possession constituted a continuous course of conduct." *Love*, 80 Wn. App. at 362.

In *State v. King*, however, the State charged King with one count of possession of a controlled substance for drugs found both in a vehicle in which King had ridden, and found on his person in a fanny pack. 75 Wn. App. 899, 901, 878 P.2d 466 (1994). The court concluded that the evidence showed "two distinct instances of cocaine possession occurring at different times, in different places, and involving two different containers—the Tylenol bottle [found in the vehicle] and the fanny pack. One alleged possession was constructive, the other actual." *King*, 75 Wn. App. at 903. The court reversed King's conviction because the trial court had failed to provide the jury with a unanimity instruction. *King*, 75 Wn. App. at 904.

*Love* distinguished *King* on the basis that a rational juror could have believed either that King possessed the cocaine found on his person but the driver possessed the cocaine found in the car, or that King possessed the cocaine found in the car, but police planted the cocaine on his person, as King presented evidence as to both of these defenses. 80 Wn. App. at 363. Love, however, did not provide distinct defenses to the different cocaine stashes found on his person and

31

in his residence; he contended that all of it had been planted by the police, leaving the jury "no rational basis to conclude that Love possessed the cocaine found on his person for personal use, and that found at the residence with intent to deliver." *Love*, 80 Wn. App. at 363.

In *State v. Furseth*, 156 Wn. App. 516, 518, 233 P.3d 902 (2010), the State charged Furseth with one count of possessing child pornography. The State produced evidence that Furseth had possessed multiple specific images and Furseth argued that he was entitled to a unanimity instruction because the jurors, in finding him guilty, could have found he had possessed different images and not been unanimous on the verdict. *Furseth*, 156 Wn. App. at 519. The court looked to *State v. Sutherby*, 165 Wn.2d 870, 204 P.3d 916 (2009), which held that the unit of prosecution for child pornography was each "possession" of child pornography, without regard to the number of individual images possessed or the number of minors depicted. *Furseth*, 156 Wn. App. at 520-21. The court ruled that the State had alleged only one "possession" of child pornography, making the case "significantly different from prosecutions held to constitute multiple acts cases." *Furseth*, 156 Wn. App. at 522. The court did not discuss the continuing course of conduct exception.

To prove that Gore unlawfully possessed a firearm in the first degree, the State had to prove that Gore "ha[d] previously been convicted of a serious offense and knowingly own[ed] or ha[d] in his possession or control any firearm." CP at 361; RCW 9.41.040(1)(a). Unlawful possession of a firearm is a "course of conduct' rather than a discrete act because that behavior takes place over a period of time rather than at one distinct moment." *State v. Kenyon*, 150 Wn. App. 826, 834, 208 P.3d 1291 (2009). Because unlawful possession of a firearm is a "course of conduct, . . . interruption in possession of a particular firearm may result in different 'possessions.'" *State v. Mata*, 180 Wn. App. 108, 120, 321 P.3d 291 (2014).

In this case, the State presented evidence that Gore had the guitar bag containing the assault rifle when Milton-Ausley picked him up. It also presented evidence that he fired one of Kitt's two handguns during the shooting at the red store.

The State charged Gore with a single count of unlawful possession of a firearm, despite evidence tying Gore to two distinct firearms. It presented evidence of Gore's "single objective" to shoot at gang rivals and how possession of either firearm would advance that ultimate goal, suggesting that the possession charge presented a continuous course of conduct rendering a unanimity instruction unnecessary. The State charged only one count of unlawful possession because the unit of prosecution for unlawful possession of a firearm is based on "course of conduct" rather than individual firearms.

Gore did not present distinct defenses to the two firearms. In fact, his defense counsel admitted in closing that Gore had possessed the assault rifle, and focused the defense on the murder and assault charges.

No unanimity instruction was required because the State alleged a single course of conduct in which Gore unlawfully possessed a firearm.

VI.    AUTOMATIC DECLINE FROM JUVENILE COURT

Gore claims he was denied due process by his automatic decline from juvenile court.[14] He claims the statute providing for automatic decline of juvenile court jurisdiction for 16- and 17-year-olds that commit serious violent offenses is facially unconstitutional. We disagree.

---

[14] This argument appears in Krentkowski's brief, but we do not address it as to him because we reverse his conviction in the published portion of this opinion. Kitt and Gore join this argument, however we address it only at to Gore because Kitt was older than 18 at the time of the offense.

Since the parties filed their briefs in this case, the Supreme Court decided *State v. Watkins*, 191 Wn.2d 530, 423 P.3d 830 (2018). The defendant in *Watkins* made an identical argument to the one Gore makes in this case. 191 Wn.2d at 533. The court ruled that there is "no constitutional right to be tried in juvenile court and, hence, no constitutional right to a [decline] hearing before being tried in adult court." *Watkins*, 191 Wn.2d at 536. We follow *Watkins* and conclude that Gore had no due process right to have his case heard in juvenile court or to have a hearing for the juvenile court to decline jurisdiction.

VII.    DOUBLE JEOPARDY

The defendants contend that the trial court violated their double jeopardy rights when it dismissed their murder in the second degree convictions without prejudice. We agree.

"The United States Constitution provides that a person may not be subject 'for the same offense to be twice put in jeopardy of life or limb.'" *State v. Chouap*, 170 Wn. App. 114, 122, 285 P.3d 138 (2012) (quoting U.S. CONST. amend. V). "Similarly, the Washington Constitution provides that a person may not be put in jeopardy twice for the same offense." *Chouap*, 170 Wn. App. at 122 (citing WASH. CONST. art. I, § 9). We review double jeopardy claims de novo. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010).

Double jeopardy prohibits "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense imposed in the same proceeding." *In re Pers. Restraint of Percer*, 150 Wn.2d 41, 48-49, 75 P.3d 488 (2003).

RCW 10.43.050 provides that defendants convicted or acquitted upon an information "charging a crime consisting of different degrees . . . cannot be proceeded against or tried for the same crime in another degree, nor for an attempt to commit such crime, or any degree thereof."

34

Courts may not "enter multiple convictions for the same offense without offending double jeopardy." *State v. Womac*, 160 Wn.2d 643, 658, 160 P.3d 40 (2007). In *Womac*, a jury convicted the defendant of homicide by abuse, felony murder in the second degree, and assault in the first degree, all with the same victim. 160 Wn.2d at 647. The trial court entered judgment on all three convictions, denied Womac's motion to dismiss the latter two counts and left both on his record, merely declining to impose sentences on them. *Womac*, 160 Wn.2d at 648-49. The Supreme Court held that this practice violated double jeopardy because, although he did not receive sentences on the latter two convictions, "he still suffer[ed] the punitive consequences of his convictions," such as an increased offender score in future prosecutions. *Womac*, 160 Wn.2d at 656.

In *State v. Turner*, the trial court conditionally vacated the lesser included crimes of two defendants, but specifically identified them as valid convictions on which the defendant could still be sentenced in the event the greater convictions were reversed on appeal. 169 Wn.2d 448, 452-53, 238 P.3d 461 (2010). This was not problematic under *Womac* because the lesser included crimes were not reduced to judgment and did not appear in the defendants records. *Turner*, 169 Wn.2d at 462-63.

*Turner* concluded that "a court may violate double jeopardy *either* by reducing to judgment both the greater and the lesser of two convictions for the same offense *or* by conditionally vacating the lesser conviction while directing, in some form or another, that the conviction nonetheless remains valid." 169 Wn.2d at 464. It held that "a judgment and sentence must not include any reference to the vacated conviction—nor may an order appended thereto include such a reference; similarly, no reference should be made to the vacated conviction at sentencing." *Turner*, 169 Wn.2d at 464-65.

35

In this case, the trial court vacated all three defendants' lesser-included convictions for murder in the second degree without prejudice. Kitt objected to this procedure and requested these counts be dismissed with prejudice. The court noted the objection for the record but did not respond to it.

Unlike *Womac* and *Turner*, where the trial court maintained the lesser included conviction contingent upon reversal of the greater conviction on appeal, the court in this case actually dismissed the lesser included convictions. However, because it dismissed them without prejudice, it left the State free to bring additional charges for murder in the second degree in the future. Double jeopardy prohibits a second prosecution for the same crime. The trial court erred by dismissing the murder in the second degree counts without prejudice.

VIII.    *MILLER* HEARING

Gore contends that the trial court erred in sentencing him because it failed to take account of his youthfulness pursuant to recent Supreme Court cases concerning sentencing of juveniles. *See, e.g.*, *State v. Ramos*, 187 Wn.2d 420, 387 P.3d 650 (2017); *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017); *State v. Bassett*, 192 Wn.2d 67, 428 P.3d 343 (2018). The State concedes that, due to developments in the law since Gore was sentenced, his case must be remanded for resentencing. We accept the State's concession and remand for a *Miller* hearing.

Washington has "consistently applied the *Miller* principle that 'children are different.'" *Bassett*, 192 Wn.2d at 81 (quoting *Miller v. Alabama*, 567 U.S 460, 481, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)). *Miller* requires that "a life-without-parole sentence cannot be imposed on a

juvenile homicide offender whose crimes reflect transient immaturity." *Ramos*, 187 Wn.2d at 436. Therefore, "where a juvenile offender facing a standard range life-without-parole sentence proves that his or her crimes reflect transient immaturity, the juvenile has necessarily proved that there are substantial and compelling reasons for an exceptional sentence downward." *Ramos*, 187 Wn.2d at 436.

A *Miller* hearing "is not an ordinary sentencing proceeding." *Ramos*, 187 Wn.2d at 443. "*Miller* 'establishes an affirmative requirement that courts fully explore the impact of the defendant's juvenility on the sentence rendered.'" *Ramos*, 187 Wn.2d at 443 (quoting *Aiken v. Byars*, 410 S.C. 534, 543, 765 S.E.2d 572 (2014)). Accordingly, a *Miller* hearing must "do far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional downward sentence is justified." *Ramos*, 187 Wn.2d at 443. In a proper *Miller* hearing, a trial court must

> receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate. The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.' It is also necessary to consider the juvenile's 'family and home environment' and 'the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.' And where appropriate, the court should account for 'incompetencies associated with youth' that may have had an impact on the proceedings, such as the juvenile's 'inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

*Ramos*, 187 Wn.2d at 443-44 (internal citations omitted) (quoting *Miller*, 567 U.S. at 477). A juvenile "cannot forfeit his or her right to a *Miller* hearing merely by failing to affirmatively request it, and all doubts should always be resolved in favor of holding a *Miller* hearing." *Ramos*, 187 Wn.2d at 443.

*Ramos* imposed the requirement of a *Miller* hearing in a case where the defendant was sentenced to a "de facto" life sentence of four consecutive sentences, totaling 85 years with no provision of law providing a possibility of parole. 187 Wn.2d at 437. "*Miller*'s reasoning clearly shows that it applies to any juvenile homicide offender who might be sentenced to die in prison without a meaningful opportunity to gain early release based on demonstrated rehabilitation." *Ramos*, 187 Wn.2d at 438.

*Bassett* held that sentencing juvenile offenders to life without parole or early release always constitutes cruel punishment in violation of article I, section 14 of the Washington Constitution. 192 Wn.2d at 91.

Gore was a juvenile at the time of his crimes. Gore raised his youthfulness as a mitigating factor at his sentencing hearing and the trial court stated that it did not see Gore's youthfulness as a basis to differentiate his sentence from Kitt's. The trial court did not specifically consider any of the various factors the Supreme Court discussed as necessities for a *Miller* hearing in *Ramos*, such as Gore's immaturity, impetuosity, failure to appreciate risks and consequences, Gore's family and home environment, the extent of Gore's participation in the crime, peer pressures, or Gore's abilities to assist his counsel at trial. The court then sentenced Gore to a standard range sentence of 82 years in prison, a de-facto life sentence. Gore's situation is near identical to that of the defendant in *Ramos* except he did not receive a *Miller* hearing equivalent to that the court stated was required in that case.

IX.     LEGAL FINANCIAL OBLIGATIONS

Kitt and Gore contend that the court erred by including a $200 criminal filing fee and a $100 DNA collection fee in their sentences. We agree.

38

While this case was pending appeal, the legislature modified Washington's LFO system. Among other changes, it eliminated interest accrual on non-restitution LFOs, made the DNA database fee non-mandatory for offenders whose DNA had already been collected due to a prior conviction, and prohibited the $200 filing fee and discretionary costs on indigent defendants. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018); RCW 10.01.160; RCW 10.82.090(1); RCW 36.18.020(2)(h); RCW 43.43.7541; LAWS OF 2018, ch. 269, §§ 1, 6, 17, 18. The amendments apply to cases on appeal when they took effect on June 7, 2018, because those cases were not final. *Ramirez*, 191 Wn.2d at 738, 747.

## SAG ANALYSIS

I. GORE SAG[15]

A. FINGERPRINT EVIDENCE

Gore contends in his SAG that his attorney did not argue that his handprints and fingerprints were not found on the guns or the vehicle involved in the shooting. He argues that he is "currently serving time for a charge but [his] fingerprints were not on any evidence that the law charged [him] with in this case." SAG (Gore) at 1.

We interpret Gore's first argument as an ineffective assistance of counsel claim for his trial counsel's failure to argue about the lack of fingerprint evidence in the case. We apply the same standard of review for ineffective assistance of counsel in a SAG as we did above. Prejudice exists if there is a reasonable probability that, except for counsel's errors, the results of the proceedings would have differed. *Grier*, 171 Wn.2d at 34.

---

[15] In addition to the arguments discussed below, Gore contends that he was "brought to jail with no additional warrants" and was "being investigated with a charge that had nothing to do with this case and . . . was detained when they did the illegal search." SAG (Gore) at 1. This argument does not inform this court of the nature or occurrence of any particular error. RAP 10.10(c). We do not respond to this argument.

The trial in this case lasted more than three weeks and included testimony of more than 40 witnesses. Although fingerprint evidence on the guns may have implicated Gore further, lack of fingerprint evidence does not prove that Gore did not possess one of the handguns. The lawyer was not deficient for failing to make this argument. Additionally, Gore has not shown that, had his attorney mentioned the lack of fingerprint evidence in closing, that the result would have likely differed. Gore did not receive ineffective assistance of counsel.

B. JUROR ISSUES

Gore contends that Juror 11 "went to sleep during the whole trial." SAG (Gore) at 1. Because no one moved to dismiss Juror 11 at trial, this issue is not preserved on appeal and we do not consider it. RAP 2.5(a).

Gore also contends that Juror 11's son was supposed to be on the jury rather than Juror 11. Kitt's attorney raised this issue in a substantive brief and Gore adopted the argument. Matters that "have been thoroughly addressed by counsel" are "not proper matters for [the] statement of additional grounds under RAP 10.10(a)." *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012).

II. KITT SAG

A. SELF-DEFENSE INSTRUCTION

Kitt contends that the trial court erred by refusing to instruct the jury on self-defense. We disagree.

"'To be entitled to a jury instruction on self-defense, the defendant must produce some evidence demonstrating self-defense; however, once the defendant produces some evidence, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt.'"

*State v. McCreven*, 170 Wn. App. 444, 462, 284 P.3d 793 (2012) (quoting *State v. Walden*, 131 Wn.2d 469, 473-74, 932 P.2d 1237 (1997)).

The standard of review of the trial court's decision whether to give a self-defense instruction "depends on whether the reason for such refusal was based on fact or law." *State v. George*, 161 Wn. App. 86, 94, 249 P.3d 202 (2011). If the trial court refused the instruction "'because it found no evidence supporting the defendant's subjective belief of imminent danger of great bodily harm, an issue of fact, the standard of review is abuse of discretion.'" *George*, 161 Wn. App. at 94 (quoting *State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002)).

"It is the rule that the accidental killing of a third person by the accused acting in self-defense would constitute justifiable homicide." *State v. Labbee*, 134 Wn. 55, 62, 234 P. 1049 (1925).

The proposed instruction in this case would have provided that the homicide was justifiable if the jury found "that the person slain or others whom the defendant reasonably believed were acting in concert with the person slain intended to commit a felony to inflict death or great personal injury." CP at 242; WPIC 16.02. The proposed instruction did not discuss self-defense against a person unrelated to the person slain. At the trial court, no one raised the fact that any self-defense argument by the defendants would relate to defending against Alexander and the other Knoccout members, not any of the victims of the murder or assault charges.

The trial court declined to give this instruction for two reasons. First, it ruled that it would be "illogical to require the State to prove the absence of self defense beyond a reasonable doubt but not give the State notice of such a defense until the end of the fourth week of trial." CP at 256. This reason is unsupported by law, as a defendant "is entitled to a self-defense instruction when, considering *all* of the evidence, the jury could have a reasonable doubt as to whether the defendant

41

acted in self-defense." *State v. Thysell*, 194 Wn. App. 422, 426, 374 P.3d 1214 (2016). The defense is not required to provide advance notice to the State of its intent to raise self-defense.

Second, the trial court found that there was "no credible evidence that the occupants of the Cadillac Escalade reasonably believed that Brandon Morris, or anyone whom the defendants reasonably believed were acting in concert with Brandon Morris, intended to inflict death or great personal injury." CP at 256.

On appeal, Kitt argues in his SAG that the trial court erred by declining to give the self-defense instruction, but focuses all his arguments on facts about the Knoccout members' allegedly threatening actions and case law about when courts should give a self-defense instruction. He does not address the trial court's stated grounds for denying the instruction, nor does he acknowledge that none of the victims in this case were the individuals alleged to have been the basis for the proposed self-defense instruction.

Because there was no evidence that Morris or his companions took any action justifying self-defense, and no one argues that self-defense should apply to the third-party Knoccout members in this case, we affirm the trial court's decision declining to give the jury instruction that Kitt proposed.

B.     FAILURE TO SEVER

Kitt contends that the trial court erred by failing to sever the joint-trial, causing him unfair prejudice. He claims that he was unfairly prejudiced by the evidence of Gore's note threatening to kill Tucker and that the limiting jury instruction was insufficient to cure this prejudice under *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). We disagree.

1.     *Bruton*

CrR 4.4(c)(1) provides:

A defendant's motion for severance on the ground that an out-of-court statement of a codefendant referring to him is inadmissible against him shall be granted unless:
       (i) the prosecuting attorney elects not to offer the statement in the case in chief; or
       (ii) deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

The Sixth Amendment provides criminal defendants a right to "to be confronted with the witnesses against him." U.S. CONST. amend VI. The admission of an out-of-court statement by a nontestifying codefendant violates a defendant's confrontation clause rights. *State v. Wilcoxon*, 185 Wn.2d 324, 330, 373 P.3d 224 (2016). In *Bruton*, one defendant confessed to a crime, implicating his codefendant, and the two were then tried together. 391 U.S. at 124. The trial court instructed the jury to disregard the confession as to the codefendant's guilt or innocence, but the Supreme Court reversed, "holding that the use of [the confessing codefendant's] confession violated [the defendant's] confrontation right, even with the limiting instruction." *Wilcoxon*, 185 Wn.2d at 330 (citing *Bruton*, 391 U.S. at 128).

In *Wilcoxon*, the Supreme Court considered how to harmonize *Bruton* with *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). 185 Wn.2d at 332. The court ruled that "the confrontation clause applies only to situations that involve out-of-court statements made by nontestifying codefendants when such statements are testimonial."[16] *Wilcoxon*, 185 Wn.2d at 333-34. Accordingly, admission of Gore's statements against Kitt only

---

[16] *Wilcoxon* was a plurality opinion. 185 Wn.2d at 337. However, five justices agreed that the confrontation clause applies only to testimonial statements; two justices simply disagreed about how to categorize a given statement as "testimonial." *Wilcoxon*, 185 Wn.2d at 336-38. Under either the plurality or concurrence test from *Wilcoxon*, Gore's threats were not testimonial statements.

violated Kitt's confrontation clause rights if Gore's out-of-court statements were "testimonial" under the confrontation clause.

"[A] statement is 'testimonial' if it is the functional equivalent of in-court testimony." *Wilcoxon*, 185 Wn.2d at 334. "A testimonial statement is designed to establish or prove some past fact, or is essentially a weaker substitute for live testimony at trial." *Wilcoxon*, 185 Wn.2d at 334.

Gore's threat to kill Tucker's family if he "snitched" was not testimonial and Kitt's confrontation clause rights were not violated by admission of this evidence.

### 2.      Unfair Prejudice

Kitt further contends that the admission of the note against Gore "was improper, unfair, and highly prejudicial" such that severance should have been granted. SAG (Kitt) at 8. We disagree.

CrR 4.4(c)(2)(ii) provides that the court should sever defendants whenever "during trial upon consent of the severed defendant, it is deemed necessary to achieve a fair determination of the guilt or innocence of a defendant." Washington law disfavors separate trials and we review a trial court's decision to proceed with joint or separate trials for manifest abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 752, 278 P.3d 653 (2012). Trial courts properly grant severance motions "only if a defendant demonstrates that a joint trial would be 'so manifestly prejudicial as to outweigh the concern for judicial economy.'" *State v. Johnson*, 147 Wn. App. 276, 283-84, 194 P.3d 1009 (2008) (quoting *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991)).

"A 'defendant must be able to point to specific prejudice' to demonstrate that the trial court abused its discretion." *Johnson*, 147 Wn. App. at 284 (quoting *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982)). A defendant may demonstrate specific prejudice by showing

> "(1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) a massive and complex quantity of evidence making it

almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a co-defendant's statement inculpating the moving defendant; (4) or gross disparity in the weight of the evidence against the defendants."

*State v. Canedo-Astorga*, 79 Wn. App. 518, 528, 903 P.2d 500 (1995) (quoting *United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir. 1985)). In this case, Kitt claims that evidence of Gore's threats to witnesses inculpated him because Gore's threats used the word "we."

The evidence showed that Gore threatened Tucker with a note that said, "Please don't snitch. Take your statement back or were [sic] gonna kill your family." CP at 40. The court then read a jury instruction which said the evidence was admitted for a limited purpose and "may only be considered by you as evidence against Jermohnn Gore and may not be used as evidence against any other defendants, including [Kitt] and [Krentkowski]." 12 RP at 2301.

The jury is presumed to follow the court's instructions. *Grisby*, 97 Wn.2d at 499. To the extent evidence of the threatening note could have prejudiced Kitt's case, the court specifically instructed the jury it should not consider the note as to Kitt. Because the court specifically instructed the jury that any evidence of the threatening note was to be considered only against Gore, it did not abuse its discretion by denying Kitt's motion to sever the trials in this case.

C.    INEFFECTIVE ASSISTANCE OF COUNSEL

Kitt claims he received ineffective assistance of counsel because his trial counsel failed to request a third-party culpability jury instruction. We disagree.

Washington does not have any standard jury instruction on "third party culpability." Kitt cites to several cases concerning when evidence that a third party committed the charged crime may be admissible at trial. *See* SAG (Kitt) at 10-11 (citing *People v. Hall*, 41 Cal. 3d 826, 833, 718 P.2d 99, 226 Cal. Rptr. 112 (1986); *Evans v. Montgomery*, No. CV 15-3296-R (JPR), 2016 WL 3457192 (C.D. Cal. May 17, 2016) (court order)).

The defense presented evidence that a blue Chevy Corsica may have fired shots toward the alley. However, if the jury believed that a shot from the Corsica killed Morris, it would not have found the defendants guilty. No further jury instruction was required to inform the jury that, if it believed that the Knoccout members or the Corsica had committed the murder, it should have found the defendants not guilty. Kitt's trial counsel was not deficient for failing to request a jury instruction on this issue and Kitt has not shown that the lack of such an instruction prejudiced his case.

D.  *MILLER*

Kitt contends that, although he was not a juvenile at the time of the crime, the court should have considered his youthfulness as a mitigating factor in his sentence because he was 23 years old at the time of the offense. He claims this court must remand to the trial court for resentencing for the trial court to consider his youthfulness as a mitigating factor. We disagree.

*Miller* and its Washington progeny are discussed above. In addition to those cases, *State v. O'Dell*, 183 Wn.2d 680, 683, 358 P.3d 359 (2015), applied the reasoning from *Miller* to a defendant who had committed his offense 10 days after his 18th birthday. The court held that age may mitigate a defendant's culpability, "even if that defendant is over the age of 18" but noted that "age is not a per se mitigating factor automatically entitling every youthful defendant to an exceptional sentence." *O'Dell*, 183 Wn.2d at 695. The court held that "a trial court must be allowed to consider youth as a mitigating factor when imposing a sentence on an offender like O'Dell, who committed his offense just a few days after he turned 18." *O'Dell*, 183 Wn.2d at 696. The court noted psychological and neurological studies that showed "'parts of the brain involved in behavior control' continue to develop well into a person's 20s." *O'Dell*, 183 Wn.2d at 691-92 (quoting *Miller*, 567 U.S. at 472).

Unlike the defendant in *O'Dell*, Kitt was 23 at the time of the shooting in this case. Nothing in the record demonstrated Kitt's particular immaturity and he has not argued that he was especially immature except for identifying his age as 23 years old at the time of the crime. Also unlike *O'Dell*, Kitt did not raise the issue of his youthfulness before the trial court. Kitt was six years older than the next youngest of all six individuals in the vehicle at the time of the shooting.

Kitt has not shown any particular youthful immaturity necessitating a *Miller* hearing.

### CONCLUSION

We affirm Kitt's and Gore's convictions, but remand for the trial court to dismiss their murder in the second degree convictions with prejudice, conduct a *Miller* hearing for Gore, and to strike LFOs from both their sentences.

Melnick, J.

We concur:

Worswick, P.J.

Sutton, J.